18 So.2d 428

**BENTON v. STATE.**

**4 Div. 332.**

Supreme Court of Alabama.

May 25, 1944.

Rehearing Denied June 22, 1944.

Powell & Fuller and Whaley & Whaley, of Andalusia, and Lee & Lee, of Dothan, for the petition.

626

Wm. N. McQueen, Acting Atty. Gen., and John O. Harris, Asst. Atty. Gen., opposed

BROWN, Justice.

The pleas in abatement filed by the defendant, petitioner here, challenge the regularity of the proceedings before the grand jury that returned the indictment,—for that: to state the substance of the averments, the solicitor of the 22nd Judicial Circuit, who participated in the proceedings was related by consanguinity to Charles Wesley Mizell, the person alleged to have been killed, said solicitor being a nephew of said Mizell; that said solicitor and his deputy for the County of Geneva, Smith, participated in the proceeding before the grand jury by examining the witnesses who were sworn in their presence, and said deputy advised the grand jury as to the law, and the circuit solicitor signed the indictment. That the circuit solicitor, and his said deputy, "were interested in the prosecution of the defendant; and that said Smith, before the grand jury convened, went into the county jail, at Andalusia, Alabama, where this defendant was then incarcerated upon the alleged charge, and then and there attempted to force, or require this defendant to make a statement relative to the alleged altercation or circumstances which resulted in the death of the said Charles Wesley Mizell."

That said acts of the circuit solicitor and his deputy were a denial to the defendant of the equal protection of the law guaranteed by the Constitution of Alabama, and the Fourteenth Amendment to the Constitution of the United States.

The circuit court sustained the state's demurrer to said pleas, and the Court of Appeals has affirmed, holding that the facts pleaded did not show the grand jurors were not drawn by the officer designated by law to draw them, nor fraud in drawing or summoning said grand jurors. Code 1940, Tit. 15, § 278; Tit. 30, § 46.

There is nothing in the law that disqualifies a circuit solicitor or requires such solicitor to recuse himself from acting in a criminal prosecution because he is related by consanguinity or affinity to the person injured or slain. 42 Amer.Juris. p. 255, §§ 20, 21. On the other hand, it is the statutory duty of "Every circuit solicitor, deputy circuit solicitor, assistant deputy circuit solicitor, county or other solicitor by whatever name called within the circuit, county or other territory for which he is elected or appointed: 1. To attend on the grand juries, advise them in relation to matters of law, and examine and swear witnesses before them. 2. To draw up all indictments and to prosecute all indictable offenses." Code 1940, Tit. 13, §§ 229, 230.

And it is the duty of deputy solicitors, among other things, to "aid or act for the circuit solicitor before the grand jury and in all matters in the circuit court when requested to do so by the circuit solicitor." Code 1940, Tit. 13, § 256.

And the Attorney General is empowered by statute to "direct any solicitor to aid and assist in the investigation or prosecution of any cause in which the state is interested, in any other circuit or county than that of the solicitor so directed." Code 1940, Tit. 55, § 236.

The record discloses that Angus A. Smith, Deputy Solicitor of Geneva County, was given written directions by the Attorney General to represent the State before the grand jury of Covington County, which convened December 8th, 1941, the date on which the indictment against the defendant was presented and returned into the Circuit Court.

The courts will take judicial notice of the order and directions issued in writing by the Attorney General, a commissioned officer of the State, to a public prosecuting officer under the statute cited supra. Prudential Insurance Co. v. Calvin, 227 Ala. 146, 148 So. 837.

When the averments of the defendant's pleas in abatement are viewed in the light of the law, the Circuit Solicitor and his assistant were acting within the line and scope of their respective duties,

and if it should be conceded that Smith's alleged acts in interviewing the defendant were unethical, it does not appear that any prejudice to the rights of the defendant were in any way affected or that any prejudice to him resulted therefrom.

Our judgment is that the demurrers to said pleas were properly sustained, and that the motion to quash the indictment on similar grounds was without merit and was properly denied.

█ The record proper shows that the court convened on November 14th, 1942, at which time defendant interposed his pleas in abatement, to which the State's demurrer was sustained; that the defendant was on said date duly arraigned, and his case set for trial on Monday the 30th of November, 1942, and a special venire ordered for his trial in compliance with the statute. Code 1940, Tit. 30, § 63. On the day set for the trial, the defendant filed a motion in writing to quash the trial venire, on numerous grounds, averring facts dehors the record, which required proof, and permitted evidence in rebuttal thereof. The court on motion of the prosecuting attorneys designated by the Attorney General to prosecute the case, made in writing, struck the motion to quash.

There is nothing in the opinion of the Court of Appeals nor on the record proper showing at what stage of the proceedings the motion to quash was filed, except it was filed in open court on the date set for trial. For all that appears, it was filed after the jury was selected, and in the absence of affirmative statement in the record or finding by the Court of Appeals to the contrary, it will be so presumed. So construing the recitals in the record, the motion to quash was too late, and the court did not err in striking it. Williams v. State, 81 Ala. 1, 1 So. 179, 60 Am.Rep. 133; Ryan v. State, 100 Ala. 105, 14 So. 766.

The defendant on his trial offered as evidence the proceedings had under the provisions of § 425, Title 15, Code 1940, including the petition of the sheriff, the "order of the Circuit Judge" appointing three reputable physicians, the report of such physicians, the order of the Judge directing the delivery of the defendant to the Superintendent of the Alabama State Hospital for observation and the report of the commission of lunacy as to the "mental condition of said defendant" filed with the clerk of the court wherein the indictment was pending. The report of the first three physicians appointed by the Judge was to the effect "that we have examined said William D. Benton and find and report to your Honor that there is reasonable ground to believe said William D. Benton to be presently insane." This report was dated April 17, 1942.

The report of the Lunacy Commission is to the effect: "It is the opinion of each of us and our opinion jointly and collectively that the said William D. Benton at the time of his admission to The Bryce Hospital on April 19, 1942, was distinctly insane, mentally delirious, confused and irresponsible. It is our opinion that he was at that time and for a considerable period of time following the date of admission suffering of a mental illness or psychosis which was due to profound drug intoxication which we name specifically 'bromide psychosis.' At the time of admission to The Bryce Hospital and during a considerable period following that date, Mr. Benton was confused, delirious, had no knowledge of his situation and showed little or no memory as to his coming into the institution, nor the conditions leading up to his admission, nor the persons accompanying him to the hospital.

"Upon the basis of the symptoms presenting in his case, a blood analysis was made through the laboratories of the institution and his blood on April 23, 1942, showed 300 m. g. (milligrams) of bromide per 100 m. l. (millimeters) of blood, which is a high degree of bromide intoxication.

"Therefore, it is our opinion that the said Mr. William D. Benton was at the time he was admitted to The Bryce Hospital, April 19, 1942, and for a brief period prior to that date insane to the extent of definitely and positively affecting his criminal responsibility. It is our further opinion that the degree or extent of criminal irresponsibility has gradually diminished as his improvement has progressed, until he has now recovered mentally and is at present criminally responsible. It is our opinion further that the commission has no information or evidence upon which it would be justified in making an opinion that Mr. Benton was on account of any mental abnormality criminally irresponsible prior to the time this bromide psychosis began to develop or manifest itself at some time prior to his commitment to the hospital and subsequent to his commitment to jail.

"Under treatment the symptoms gradually and slowly subsided and Mr. Benton has gradually improved in mentality until at present it is our opinion that he is normal mentally and entirely and fully responsible.

"While it is impossible for this Commission to make a positive and definite opinion upon a basis of knowledge of facts except from the date of admission, April 19, 1942, to the present date, upon a basis of our general knowledge and information as to the development of such a psychosis as Mr. Benton was suffering of at the time of admission, it is our opinion that this psychosis gradually developed during an indefinite period prior to admission to The Bryce Hospital, and such development of mental illness in our opinion came after it became necessary for him to take such sedative drugs following his commitment to or incarceration in the prison or jail.

"Based upon a study of the Court record in the trial of Mr. Benton and on what history there was available for the study of the Commission, it is our general opinion that Mr. Benton was normal mentally and responsible until the date of commitment to jail following the crime, or until sometime following the time it became necessary to prescribe large quantities of bromides or other sedatives. * * *."

■ The court sustained objection to this proceeding and refused to admit it. The defendant excepted. As a general rule judicial records are admissible in evidence in the same or a subsequent litigation, if relevant to the issues involved and shed light upon the issues being tried, and inquisitions or reports made by authority of law under oath, or by an officer of the State under sanction of an oath, are generally received as evidence of the facts stated, if the contents of such inquisitions or reports are of public interest and intended for public information, but not conclusive. United States Life Ins. Co. in the City of New York v. Elizabeth Kielgast, Admrx., 129 Ill. 557, 22 N.E. 467, 6 L.R.A. 65–67; Woodmen of the World Life Ins. Soc. v. Guyton, 239 Ala. 216, 194 So. 655; Richardson v. State, 204 Ala. 124, 85 So. 789; Reid v. State, 168 Ala. 118, 119, 53 So. 254; 20 Am.Juris. page 843, § 494.

■ The reports of the physicians and the Commission of Lunacy offered in evidence by the defendant were not made under the sanction of an oath and were not intended for general public information. The statute provides: "As soon as such commission of lunacy has reached a conclusion, within the time and in the respect as hereinabove set forth, as to the mental condition of such defendant, it shall make a full written report thereof to the clerk of the court in which the indictment against said defendant is pending, which report shall be placed on file and be accessible to the court, to the solicitor and to the counsel for defendant." Code 1940, Tit. 15, § 425.

The purpose of said report, as the statute clearly indicates, is for the information of the presiding judge to aid him in determining what proceedings shall be taken in respect to the defendant after such report is filed. The ruling of the court in this respect was free from error.

■ The Court of Appeals applied the doctrine of error without injury to the statement of the solicitor to the effect: "We all know as a matter of common knowledge that over indulgence in liquor is just like taking too much bromide."

In the absence of a full and complete statement of the facts, in the court's opinion, this court will not review the Court of Appeals on the application of that doctrine.

The writ of certiorari is due to be denied. It is so ordered.

Writ denied.

All the Justices concur.