232 So.2d 687

**William T. HUTCHENS**

**v.**

**STATE.**

**8 Div. 29.**

Court of Criminal Appeals of Alabama.
Jan. 13, 1970.

Rehearing Denied Feb. 3, 1970.

G. Wade Green, Huntsville, for appellant.

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

CATES, Judge.

Hutchens has appealed from his conviction of the statutory crime of attempting to kidnap in order to obtain money. Code 1940, T. 14, § 8. The jury set his punishment at the minimum of five years imprisonment.

I

Hutchens, 47 years old at trial, had been a 50–50 partner with his father in H & H Walgreen Agency Drugs. The father died December 4, 1965, survived (besides appellant) by his widow, Susie Newman, three daughters, Eleanor, Margaret and Sue, and several grandchildren.

Between father and son there was a contract that the survivor could buy the interest of the decedent for $100,000. Also, the father held a note of the partnership for $63,000. This latter instrument seems to have caused dissension between appellant and his sister Eleanor, who along with the mother, executed the father's will.

Hutchens, individually and doing business as H & H Walgreen Agency Drugs, was by 1967 in the bankrupt court. He received a discharge in the spring of 1968.

At his trial, his sister Eleanor, the victim of appellant's attempt to kidnap her, testified in part as follows:

"Q  Now, did you see him on the morning of June 3 [1968]?

"A  Yes.

"Q  Where did you see him?

"A  I first saw him in the backyard of my mother's house, 300 Williams.

"Q  Do you know approximately what time that was?

"A  I think it was a little after 7:30 A.M.

"Q  All right.  Did you go into the backyard?

"A  Yes, I did.

"Q  For what purpose?

"A  To take my little dog to his pen.

"Q  How were you dressed at that time?

"A  I had on pajamas and a bathrobe.

"Q  Did you then return from the dog pen?

"A  Yes.

"Q  Did you see any person in the yard other than yourself at that time?

"A  Yes.  On my way back toward the house, after I had stopped to turn on a hydrant with which I was going to wash the dog's dish, I saw a man's face peering around the corner of the house, the opposite corner.

"Q  Did that man come forward?

"A  Yes.

"Q  Did you recognize that person?

"A  Yes.

"Q  Who was it?

"A  It was my brother, Bill Hutchens.

"Q  Did he have anything in his hands?

"A  Yes.  He was carrying a gun.

"Q  I will show you this rifle.  I ask you if it was anything similar to this?

"A  Yes, it was.

"Q  In what manner was he holding it?

"A  He was pointing it at me.  He had it in both hands and pointed it at me.

"Q  What did you do?

"A  I stopped.

"Q  Did you say anything?

"A  Yes.

"Q  What did you say?

"A  I said, 'What are you going to do?'

"Q  Did he say anything then?

"A  He said, 'Probably kill you.'

"Q  All right.  What next occurred?

"A  He told me to go into the house.

"Q  What did you do?

"A  I stood still.

"Q  Did he say something else then?

"A  Yes.  He said, 'This has a silencer on it.'

"Q  Then what did you do?

"A  I went into the house.

"Q  Now, when you went into the house did he go into the house with you?

"A  Behind me.

"Q  Now then, did you stop in the house?

"A  Yes, I did.

"Q  In what portion of the house did you stop?

"A  The back hall.

"Q  Did he say anything then?

"A  Yes.  He said, 'Get mother up.'

"Q  Now, where you stopped there is that near your mother's bedroom?

"A  Yes.

"Q  Now then, did you say anything in response to that?

"A  I said, 'She's already up.  Her little dog is here.  So that means she has taken him out.'

"Q  What did he say?

"A  He said, 'I know that.  I watched her.'

"Q  What did you say then?

"A  I said, 'Please don't involve mother in this.'

"Q  What did he say?

"A  He said, 'This gun has 16 bullets in it and you're really going to look a mess when I put them all into you.'

"Q What else did he say?

"A He told me again to open the door to mother's room.

"Q Then did you do so?

"A Yes. I first said, 'Bill when you have killed me and I'm lying here on the floor and you can't bring me back the awful thought is going to come to you that I have never done anything to you.'

"Q What did he do or say then?

"A He told me again to get mother up and said, 'I want her to watch you die.'

"Q Then what next occurred?

"A I hesitated. He said, 'You've got ten to get that door open.'

"Q Then what did you do?

"A I opened the door.

"Q Did he say anything as you opened it?

"A He said, 'Don't slam that door.'

"Q Then what did you say?

"A I opened the door widely, like that (indicating) and said, 'Mother must be taking her bath.'

"Q What did he say then?

"A He said, 'Well, go in. We'll wait for her.'

"Q Did you then go into the room?

"A Yes, I did.

"Q Did you take a seat?

"A Yes. I sat in a chair in the room.

"Q Did he sit down?

"A Yes.

"Q What did he do with the rifle he had?

"A He kept it pointed at me.

"Q Then was there any conversation between the two of you at that point, while waiting for your mother?

"A Yes. I believe it was at that time when he said, 'I'm going to make such a blood bath in this house that people will talk about it around here for a hundred years.'

"Q Then did your mother come into the room?

"A Yes.

"Q What is your mother's name?

"A Susie N. Hutchens.

"Q That's Mrs. M. M. Hutchens or Susie N. Hutchens. Is she referred to as Miss Susie by most everyone?

"A Yes.

"Q Now, when she came into the room did she do anything at all, the first time she came into the room?

"A She shut the door that I had opened to come into the room and then turned around toward us.

"Q Did she do anything else at that time?

"A I shouted at her, 'Mother, its Bill Hutchens and he's got a gun.'

"Q Did she do anything in response to that?

"A No, she did not react, except that she looked vaguely around the room.

"Q Does your mother hear well?

"A No.

"Q Does she wear a hearing aid?

"A Yes.

"Q Do you know whether or not at that time she had it on?

"A I can't say by visual observation; but I know her hearing well enough to know that since she did not hear what I said she did not have on the hearing aid.

"Q Did she leave and go and get a robe?

"A Yes.

"Q Did she return to the room?

"A Yes.

"Q Then did you repeat this statement to her that, 'It's Bill Hutchens and he has a gun?'

"A Yes, I did.

"Q Did you say it loudly?

"MR. GREEN: We object to leading the witness.

"THE COURT: Don't lead her.

"Q You say your mother returned to the room?

"A Yes.

"Q What did you say to her?

"A I repeated once more, more than once, 'Mother, it's Bill Hutchens and he has got a gun.'

"Q What did your mother say?

"A She walked toward the bed where Bill was sitting with the gun and said, 'Bill, leave this house. I have told you never to come here.'

"Q All right. What did he say?

"A He said, 'I'm going to shoot Eleanor.'

"Q What did your mother say in response to that?

"A She came over to me and put her arms around me and said, 'Oh, Eleanor.' And then she told Bill again to leave.

"Q What else did she say?

"A She said, 'Bill, I can't stand this.'

"Q What did he say to that?

"A He said, 'Then die. Why don't you die?'

"Q Did she say anything then?

"A Yes. She put her hands up to her forehead and walked down the room behind the bed where he was sitting and said, 'Oh, Morton, Morton, come back and tell me what to do.'

"Q What did Bill say then?

"A He said, 'If you don't have $158,000.-00 in cash here by 11 o'clock I'm going to shoot Eleanor.'

"Q Then what did she say?

"A She said, 'Where would I get $158,-000.00?'

"Q What did he say?

"A He said, 'The bank will let you have it on your note.'

"Q What did she say then, if anything?

"A She came over to me and said, 'Eleanor, what shall I do?'

"Q What did you say?

"A I said, 'I don't know, Mother.'

"Q Then did she say anything at all?

"A She said, 'Well, I'll call Louis.'

"Q What did Bill say to that?

"A He said, 'Good. I would like to blow his brains out too.'

"Q Then what did your mother say?

"A She said, 'Well, I won't call him then.'

"Q What did Bill say to that?

"A Bill said, 'No, go on and call him. You better get started.'

"Q What was next said or done?

"A Mother said, 'Well, he can't get any money from the bank at this time of the morning.'

"Q What did Bill say?

"A He said, 'Well, he better get started.'

"Q Now then, did your mother do anything at that time?

"A Yes. She went to the telephone.

"Q Of course, you don't know what was said on the other end?

"A No. All I noticed, in fact, was— I didn't say this awhile ago. While Mother was out of the room getting her robe Bill had removed the bedside telephone from its cradle and I was watching that. After she called and said, 'Louis, Bill is here and he's going to shoot Eleanor unless we have $158,000.00 for him by 11 o'clock,' at the end of that conversation, she put the phone back on the hook.

"Q After she called Louis did she leave the room?

"A She left the room, yes.

"Q Now, was there a conversation between you and Bill after she left the room?

"A Yes.

"Q What did he say?

"A He said, 'You all have been wondering where I got the money to live on these last two years. Well, I'm the best in the business.'

"Q What did you say?

"A I said, 'What business?' He said, 'I'm an assassin and the best in the business.'

"Q What else did you say to that?

"A I asked him if he had killed Martin Luther King.

"Q What did he say?

"A 'No.'

"Q What was next said then?

"A He said something about the Banana Republic. He said that it was possible to fly into some of those countries low, approaching an airport low so as to avoid customs and that he had flown in under 100 feet. He said he already had his passport, but that he could get in without going through customs.

"Q Did he ask you anything about the automobiles in the garage?

"A Yes. He said, 'Whose car is that with the Virginia license?'

"Q What did you say?

"A I said, 'It belongs to a young woman who is doing some work for me.'

"Q Did he ask where she was?

"A Yes. He said, 'Is she upstairs?'

"Q What did you say?

"A I said, 'Yes.'

"Q Did he ask about your automobile?

"A Yes. He said, 'Where is mother's old car,' which is now my automobile. I said, 'My aunt is using it because she had her automobile damaged in the garage.'

"Q What did he say in response to that?

"A He said, 'I know. I checked that garage.' And he described the damage briefly.

"Q Did he in his conversation then make reference to any other person outside the house?

"MR. GREEN: We object to that. He is putting thoughts in her mind. She can tell the story.

"THE COURT: I will overrule as to that question.

"Q Did he?

"A Yes. He told me that he had an outside man. And I think it was at that time that he told me he had a gunman stationed on top of the Masonic Temple.

"Q What was next said then?

"A I believe it was at about that time that the front door knocker was

"A heard. He said, 'That damn Louis has called the police.'

"Q What ·else did he say?

"A He said, 'Now the police are here. I'm going to have to kill you.'

"Q Did you see any other person come to the door?

"A To the door of the room?

"Q Yes, ma'am.

"A Yes. A uniformed officer came to the door of the room.

"Q Did he say anything?

"A Yes.

"Q Now then, when the uniformed officer came to the door what did you see Bill Hutchens do?

"A I didn't see him do anything; but when I looked toward him I noticed that he had his hands crossed like this in his lap and he had the pistol pointed toward the officer and he still had the long gun pointed toward me.

"Q What did the officer say?

"A He said, 'Mr. Hutchens, what seems to be the trouble here?'

"Q What did Bill say?

"A He said, 'No trouble.'

"Q What else did the officer say then?

"A He said, 'Well, won't you put your guns down and come outside and tell me your troubles?'

"Q What did Bill say?

"A Bill told him to get out.

"Q Did the officer leave?

"A Yes, he did.

"Q Then what did Bill do?

"A He got up and went and locked the door. The door has a thumb latch on it. He turned that.

"Q Now then, what else did he say with reference to anybody interfering with him?

"MR. GREEN: We object to him continually putting words in the witness's mouth.

"THE COURT: I sustain the objection.

"Q What else did he say?

"A Well, he did some more talking about guns. As we again heard more noise outside he said, 'If anybody interferes with me I'll make a U-turn and come back and kill every member of the family and burn this house down.' Then he began to describe a method for burning the house down.

"Q Now then, did you at that time begin to feel any different physically?

"A Yes. When the officer was in the room I began to feel pains in my chest and down my left arm. These became more and more intense, until I was bent over.

"Q Did you say anything to Bill about that?

"A Not at first; but when they became extremely severe I said, 'Bill, there is a bottle of nitroglycerin in that bedside table.' And he went and got the bottle of nitroglycerin and said, 'It would be a hell of a note if you died of a heart attack and deprived me of the pleasure of killing you.'

"Q Did you then take the nitroglycerin tablets?

"A Yes.

"Q What did he say then?

"A Well, he asked me whether the nitroglycerin tablets were doing any good. I said, 'No.' The pains became more acute and I bent over

"A more. He said, 'Hell, I had better call a doctor.'

"Q Then did he go to the phone?

"A Yes, he did.

"Q Did you later see another person come in the room then?

"A Yes, sir.

"Q Who was that?

"A Dr. James Jordan.

"Q When he came into the room what occurred?

"A Dr. Jordan came to me where I was sitting in the chair and he said, 'Now, let's get you into the bed.' He helped me to the bed. There are two beds in that room. Bill was sitting on one and my mother had occupied the other, which was not yet made up. Dr. Jordan helped me get into that bed, the one Mother had been in.

"Q Did Bill let Dr. Jordan into the room?

"A Yes, he did.

"Q Did he lay his weapons down to do that?

"A No, he had his pistol.

"Q Did he lock the door behind Dr. Jordan?

"A Yes.

"Q Then did he keep his weapons there on you while you were being treated by Dr. Jordan?

"A Yes.

"Q What did Dr. Jordan do for you?

"A He examined me briefly and gave me an injection, a hypodermic injection.

"Q Did he say anything to Bill?

"A Yes. He said, 'Bill, put down those guns.'

"Q What did Bill say?

"A He refused. I forget his exact words.

"Q Now then, did Dr. Jordan then leave the room?

"A Yes.

"Q What is the next thing you remember occurring?

"A I remember I began to get drowsy and groggy.

"Q Do you know Mr. Salmon?

"A Yes, sir.

"Q That's Louis Salmon?

"A Yes.

"Q Is he an attorney for the estate?

"A Yes.

"Q Do you know a Mr. Ziedman, an attorney from Birmingham?

"A I had seen him in bankruptcy court. I don't believe I had met him. I knew him by sight.

"Q Did you see him come into the room?

"A Yes.

"Q Did you sign some sort of a document?

"A Yes.

"Q Then did Bill say anything to you with regard to the prosecution of him, if you recall that?

"Yes. He asked me to give him my word that I would not prosecute him.

"Q Did you do so?

"A Well, only after Mr. Ziedman had intervened and said, 'Bill, if you're going to commit a crime, which it looks as if you are about to do, the State of Alabama would be prosecuting you.'

"Q  I see. What did you say then?

"A  So I promised not to prosecute, not to initiate prosecution of Bill.

"Q  Did you initiate prosecution of Bill?

"A  No.

"Q  Now then, back here before did he or did he not ask you where your clothes were?

"A  Yes, at some time—let's see, while I was there groggy in bed, that time is very vague to me. Sometime while I was in bed he said, 'Where are your Clothes?'

"Q  What did you say?

"A  I said that they were upstairs in my room.

"Q  What did he say them?

"A  He said, 'I'll have to have them to get you out of here.'

"Q  Then after you saw Mr. Ziedman and Mr. Salmon and you signed some type of document what is the next thing you remember?

"A  Mr. Ziedman went out of the room and came back in carrying a large sack. He said, 'Here it is, Bill. Do you want to count it?' Bill began handling the strings on the top of the sack and then he looked at it and said, 'No, it's got the bank seal on it. It's all right.'

"Q  Did they then leave the room together?

"A  Well, Mr. Ziedman first told Bill—he had. told him this before, I believe, that he would not go out of the room with any guns. He said, 'Bill, I'm scared of guns. Put those guns down. I will not go out of here with you carrying any guns.'

"Q  What did Bill say?

"A  Well, he argued with him. I have forgotten the exact exchange. Then when they were about to go out with the money he searched Bill, had him hold his hands up and he ran his hands down his sides.

"Q  Did Bill have this sack himself?

"A  Yes.

"Q  Did they then leave the room?

"A  Yes, they did.

"Q  What is the next thing you remember?

"A  A man that I did not know in civilian clothes came into the room and said, 'Are you unharmed?' I said, 'Yes.'

"Q  What did he say?

"A  He said, 'We got him.'"

Without objection as to *anticipating defense evidence,* the State in its case in chief presented a psychiatrist, Dr. Hardin Ritchey, who had observed Hutchens in 1968 at Hillcrest Hospital. This witness was of the opinion that as of June 3, 1968, the date of the alleged crime, Hutchens was able to distinguish right from wrong.

On cross examination, it was brought out that Dr. Ritchey had observed Hutchens for about a total period of sixty minutes. This personal observation seems to have been in addition to other examination of the patient by the hospital staff. A psychiatric report was prepared based on Hutchens's confinement in that hospital from June 22 through July 1, 1968.

Hutchens apparently went from Hillcrest Hospital to Bryce State Hospital at Tuscaloosa. There he stayed until October 22, 1968. Over objection of defense counsel, the entire file from Bryce Hospital, which had been transmitted to the District Attorney, was received in evidence with the exception of one page of

the transcript of an interview with Hutchens.

After the State rested, Hutchens took the stand in his own behalf. He did not deny any of the salient acts of June 3. He did testify that for some period of time before that date he had been drinking "better than a quart" of whiskey every day. A large part of his testimony went into the controversy between himself and his sister, Eleanor, apparently, to justify, as a claim of right, his demanding the $158,000.00.

## II

Hutchens had pleaded not guilty by reason of insanity, as well as the conventional not guilty. Insanity by statute (which altered Parsons v. State, 81 Ala. 577, 2 So. 854, following Boswell v. State, 63 Ala. 307) puts the burden on the defendant to "clearly" prove such defense to the reasonable satisfaction of the jury. Code 1940, T. 15, § 422, from Act 429, February 27, 1889.

In Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302, it was contended that a statute of that state burdening the defendant to prove his sanity beyond a reasonable doubt was contrary to due process under the Fourteenth Amendment. The court rejected this contention 7–2, Black and Frankfurter, JJ., dissenting.

■ Since the Oregon statute was there more onerous on the defendant than § 422, supra, we entertain no doubt as to the latter's validity on the face of its wording. This despite People ex rel. Juhan v. Dist. Court, Colo., 439 P.2d 741. In this conclusion, we view Timmons v. Peyton, 4 Cir., 360 F.2d 327 as an exception which illuminates the general.

## III

We are confronted, however, with the propriety of the trial judge's admitting into evidence State's Exhibit "40."

■ We do not think that the State, by putting Dr. Ritchey on the stand as its own witness, waived its statutory right to put the defendant to proof of his plea of not guilty by reason of insanity. Rather, we view the introduction of this testimony as a device to save the time of the witness whose attendance fee was paid for by the State, as well as the time of the court. In this connection, we note that the defendant never withdrew his plea of not guilty by reason of insanity and, hence, we do not view this testimony as any back door attempt to change the rule as to the burden of proof on this issue.

State's Exhibit "40" was apparently the entire file of Hutchens at Bryce Hospital. It is in three sections. It begins with the application of the Probate Judge, under date of June 8, 1968, for the admission of Hutchens as a patient.

Thereafter, the exhibit contains, among other papers, correspondence and replies, inter-office communications, laboratory reports, dental charts, police reports, statements to social workers, interviews with the defendant, his family and friends, minutes of a conference of doctors, correspondence to and from the Social Security Administration regarding disability benefits, consent form for possible insulin or electric shock treatment, all under oath by the Superintendent of the Hospital as "the official and complete record" of Hutchens.

It appears that the prosecution obtained this file in February 1969 in response (by mail) to a subpoena duces tecum issued under Act 818, September 11, 1951. This Act relating to District Attorneys reads in (b) of § 1 as follows:

> "They shall have authority at any time the Grand Jury is not in session to issue subpoenas to persons to come before them, and they shall have power to administer oaths to said persons and examine them as to any violation of the criminal laws of the State."

The admission of this file as a self-proving piece of evidence, as a business

record or as a memorial of a governmental act is unwarranted under decisional and statute law. Ward v. State, 44 Ala.App. 229, 206 So.2d 897 presented a hospital report through the medium of a doctor (psychiatrist) who had both observed Ward and had charge of records. Code 1940, T. 45, § 226 calls for testimony by deposition but only with consent of the defendant. Benton v. State, 31 Ala.App. 338, 18 So.2d 423 and 245 Ala. 625, 18 So.2d 428.

It was also error for the court to read to the jury after they requested a definition, a dictionary definition of "paranoia."

■ Unless a statute provides otherwise, evidence generally only comes into court through articulation by a witness. That is, except for those things self-proving or matters presumed or noticed without proof, there is no anonymous evidence.

True in Stoudenmeier v. Williamson, 29 Ala. 558, we find:

"In the case of the Attorney-General v. The Glass Plate Company, 1 Anstr. 39, the question was on the proper construction of the word 'square,' as found in an act of parliament. The court held, that the construction of the statute was a question of law, with which the jury had nothing to do, and hence it was improper to read books to the jury to explain this term of art found in the act. The chief baron, in delivering the opinion of the court, said, that to allow the evidence would be to make the construction 'a question of fact in place of a question of law.' He proceeded, however, to remark, that a judge 'may well inform himself from dictionaries or books on the particular subject, concerning the meaning of any word.'

\*    \*    \*    \*    \*    \*

"We think that medical authors, whose books are admitted or proven to be standard works with that profession, ought to be received in evidence. \* \*"

■ Yet we believe that the necessity of proof or stipulation as to the scientific acceptance of the quoted work is a sine qua non to its admissibility. Thus, Lawson, J., in Smarr v. State, 260 Ala. 30, 68 So.2d 6 stated:

"But relevant extracts from medical treatises are not in themselves self-proving, but are admissible only when recognized and approved by the medical profession as standard. The work in question was not shown to be a standard work or recognized authority by the medical profession on the subject at issue, and the rulings of the court in regard thereto were without error."

■ Inasmuch as need for the definition sprang solely from the jury's access to State's Exhibit "40," we consider that the word "paranoia" here was in context related only to the plea of not guilty by reason of insanity. Therefore, we consider it here a word of medical art rather than one in the public domain. It follows that its definition from a dictionary [1] was incomplete without "sworn evidence of an expert witness that [the excerpt from] such treatise is esteemed by the professions as good authority on the subject." City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 122 A.L.R. 637. We have found no case construing "facts of general notoriety and interest," as used in Code 1940, T. 7, § 413.[2]

We have gone to the original Supreme Court record of Burns v. State, 226 Ala. 117, 145 So. 436 to ascertain the connective predicate for the proferred text on paranoia. There an expert had identified Dr.

---

1. We treat this instance as an exception to Adler v. State, 55 Ala. 16. See McElroy, Evid. (2d ed.), § 258; Dictionaries.

2. "Historical works, books of science or art and published maps or charts, when made by persons indifferent between the parties, are prima facie evidence of facts of general notoriety and interest."

White's book as a then recognized authority in the field. Without the imprimatur of an expert, we do not think an abridged dictionary has independent standing for authority on so conceptualized a notion as is gathered up in the medical word paranoia.

■ In view of the absence of any testimony by Hutchens himself reflecting on his sanity and, since the defense on cross examining Dr. Ritchey brought out no conflict whatsoever with his testimony on direct examination, we conclude that the admitting of State's Exhibit "40," while erroneous, was nevertheless harmless. Indeed, if anything, it furnished more ammunition for a defense of mental irresponsibility so that, apparently, the jury was so confused as to have to ask the trial judge to read the definition of "paranoia" from a dictionary. Hutchens received the minimum punishment at the hands of the jury, i. e., five years.

## IV

The indictment which tracks our statute (T. 14, § 8) in Count 2 charges:

"* * * William T. Hutchens * * * did forcibly or unlawfully attempt to confine or conceal Eleanor Hutchens with the expressed or implied purpose to extort, conceal, demand, receive, or require the payment of money for the release, surrender, return or delivery up of said Eleanor Hutchens so forcibly or unlawfully attempted to be confined or concealed, against the peace and dignity of the State of Alabama."

This section reads:

"Any person who forcibly or unlawfully attempts to confine, conceal, seize, decoy, entice away, or attempts to inveigle any human being, or who aids or abets therein, or who attempts to cause any human being to be so forcibly or unlawfully confined, concealed, seized, decoyed, enticed away, or inveigled without this state, with the intent or purpose, expressed or implied, to extort, compel, demand, receive or require the payment of money, or the conveyance, or delivery of property, or other thing of value, for the release, surrender, return, or delivery up of the person so forcibly or unlawfully attempted to be confined, concealed, seized, decoyed, enticed away, or inveigled or so brought within this state, after having been attempted and—or threatened to be forcibly or unlawfully confined, concealed, seized, decoyed, enticed away or inveigled without this state, from such person or from his or her friends or relatives or any other person, shall be guilty of the offense of attempt to kidnap, and on conviction, shall suffer death or imprisonment in the penitentiary for not less than five years, at the discretion of the jury trying the case."

The defense assigned various grounds of demurrer to the indictment. The only one which we consider meritorious involves the absence of an allegation by whom the ransom was to be paid.

■ Though such detail could be stated, nevertheless, we do not consider that it is an indispensable allegation so as to inform the accused within requirements of the Constitution as to specificity. United States v. Bentley, 6 Cir., 310 F.2d 685

Why would it not have been permissible merely to have said that "William T. Hutchens did unlawfully attempt to kidnap[3] Eleanor Hutchens for ransom"? Ransom can be extracted from numerous

---

3. Doss v. State, 220 Ala. 30, 123 So. 231 and 23 Ala.App. 168, 123 So. 237 both cite Blackstone for dicta that at common law kidnaping was the forcible abduction of a person from his own country and the transportation of him to another. iv Bl. Com. 219. However, a careful reading of East, P.C. (i, 429) shows that kidnaping can be more general, i. e., "the stealing and carrying away, or secreting of any person, * * *." The author there cites as an illustration 43 Eliz. I. c. 13 (1601) to punish the mischief of kidnaping in the northern counties and

persons. Thus, to free Richard the Lion-Hearted from durance in Schloss Dueren-stein, the barons of England were levied upon to pay the Babenberg Leopold V 150,000 marks. Certainly, Leopold cared not a whit whence came his extortion.

In any event it is pertinent to observe that T. 14, § 8, supra, does not rest on assimilation of common law terms. Burdick, Law of Crime, § 387, aptly points out:

"But interest in common law kidnapping is now only historical, because in all jurisdictions of this country kidnapping is now punished by statute, and these statutes have progressively extended the scope of the offense. * * *"

■ Hence, we content ourselves with the comment that § 8, supra, does not mention as material who is being asked for "the payment of money * * * for the release * * *." Unlike crimes such as larceny, robbery and burglary wherein consent of the owner of the property obviates an element of the offense, the willingness of the owner or owners of the ransom is alien to the actor. Basically, though with animus lucrandi, kidnaping—for or not for ransom—is an offense against the person.

The instant accusation used the language of T. 14, § 8. There is here no need for a detailed auxiliary recital of the quo modo because § 8 is explicit enough when we inspect Count 2 in conjunction therewith.

There was no error in overruling the demurrer.

## V

A motion for new trial was duly filed and laid before the trial judge. One of the grounds thereof was based on a conversation between the bailiff in charge of the jury and another person not otherwise identified. The conversation purported to relate another colloquy between the bailiff and jurors regarding the operation of the probation, pardon and parole laws.

■ However, it was not shown that the veniremen addressed were members of the jury trying Hutchens. We consider that the scarcity of proof as to what transpired insofar as Hutchens's trial might have been prejudiced by this talk is such that we are not justified in disturbing the lower court's denying the motion.

## VI

We have carefully considered the entire record under Code 1940, T. 15, § 389 and consider the judgment of the circuit court is due to be

Affirmed.

### On Rehearing

We consider that Act No. 77, approved September 30, 1965, p. 102 is not by the terms of its first clause pertinent so as to justify admission of Exhibit "40." Accordingly, we do not decide whether the words therein of "any suit or proceeding" embrace criminal trials. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 and Douglas v. Ala., 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 might indeed narrow the scope of the broad language found in Todd v. State, 13 Ala.App. 301, 69 So. 325.

Nevertheless, we adhere to the view that Supreme Court Rule 45 averts error.

Application overruled.

the levying of ransom and blackmail. Concealment within the county was also therein denounced. East indicates that kidnaping proper may well carry the implication of transportation abroad. However, he calls this an aggravated degree of forcible abduction. See Russell on Crime (11th ed.) 769; State v. Harrison, 145 N.C. 408, 59 S.E. 867; State v. Rollins, 8 N.H. 550 (the leading case).