[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 30 
First degree murder; sentence: life imprisonment.
On the night of January 14, 1975, at approximately 11:00 P.M., Gordon Presnall was shopping at a fruit stand in Saraland, Alabama. Without any apparent motive or reason, Mr. Presnall was shot in the back of the head with a shotgun, and he died as a result. An empty shotgun shell was found at the scene. No one actually saw the shooting, nor could anyone identify the assailant who fled the scene.
The appellant purchased a shotgun at a pawn shop four days before the shooting. That shotgun proved to be the same weapon that fired the empty shell found at the scene of the crime. In addition, the appellant stated to some companions after the shooting that he had "blowed that dude away." The appellant also stated to the police that he had control of the shotgun from the day he bought it until the day of his arrest, January 21, 1975. Without going into unnecessary detail, we conclude from the record that the State put on sufficient evidence upon which the jury might reasonably rely to find the appellant guilty. Morton v. State (1976) Ala.Cr.App., 338 So.2d 423.
 I
Before trial, the appellant made a motion for a sanity inquisition. The trial court empaneled a jury pursuant to Title 15, § 426, Code of Alabama 1940, and a hearing was commenced on November 19, 1975. The appellant contends that the jury's finding, on November 20, 1975, on competency *Page 31 
to stand trial was palpably erroneous and was influenced by highly prejudicial and incompetent testimony. We do not agree.
A psychiatrist and a clinical psychologist both testified that the appellant was insane and mentally incompetent to stand trial. It was their expert opinion that the appellant was a paranoid schizophrenic and that he was unable to communicate with others in a reasonable fashion. A long-time neighbor of the appellant, who was a former psychiatric aid, and the appellant's step-father testified that in their opinion the appellant was crazy. The appellant's I.Q. was found to be approximately 62.
The State called two psychiatrists and a psychiatric social worker, all of whom observed the appellant at Searcy State Mental Hospital. They opined that the appellant was sane and competent to stand trial. In their opinions, the appellant suffered from an anti-social personality. They said the appellant could cooperate with counsel in the preparation of his defense. One of the experts, Dr. William H. Rudder, expressed his disbelief that the appellant's I.Q. was only 62 because the appellant was a high school graduate and had attended college for a short period. The appellant's guidance counselor was called in rebuttal. He testified that the appellant never scored over 10% on a test and that he was an abnormal individual.
During the sanity hearing, the trial court warned each witness not to mention the nature of the charge against the appellant. However, Dr. Rudder, in a heated exchange during cross-examination and apparently inadvertently, stated that the appellant was "here on a murder charge." The appellant contends that a mistrial should have been granted because of the admittedly prejudicial disclosure. Upon Dr. Rudder's disclosure, the trial court had the jury stand and take another oath and then admonished the jury in pertinent part as follows:
 ". . . I have advised you from time to time that we are not concerned with the nature of the offense; I have told every witness who has taken this stand that we are not concerned with the nature of the offense. There has been a word mentioned by this witness which has described the offense. That word is due to be stricken from this record; it has no standing in this case whatsoever. I ask you, does any juror in this room feel that you would be influenced by having heard that word, and that that word might possibly have any effect on your verdict; if it does, it's your duty as a juror to stand and tell us. (No response.) Is the jury telling me that you will continue to not consider the nature or the description of the offense, but that you will confine yourselves to a determination of the man's ability to know and understand what's going on in this Courtroom today; can you each do that? Those who can, please hold up their hands. (All jurors raised their hands.) There are twelve hands; and at this time the Motion for a Mistrial is denied."
In view of the above admonition by the trial court, any error which flowed from Dr. Rudder's statement was rendered harmless.Adair v. State, 51 Ala. App. 651, 288 So.2d 187 (1973). We know of no authority, case or statutory, requiring reversal because the nature of the offense is disclosed to a special jury hearing testimony on the accused's competency to stand trial. This is especially so since the trial judge determines competency and the use of the procedure set out in Title 15, § 426, supra, is a discretionary tool he may use to aid him in his decision. Wheeler v. State, 47 Ala. App. 457, 256 So.2d 197
(1971); Duncan v. State, 46 Ala. App. 732, 248 So.2d 771 (1971).
Also during the competency hearing, the State successfully sought the introduction of the lunacy report of Searcy Hospital. Title 15, § 425, Code of Alabama 1940 (Recompiled 1958). The appellant contends the trial court erred to reversal by admitting hearsay, citing Benton v. State, 245 Ala. 625,18 So.2d 428 (1944), and Ex parte Moody, 41 Ala. App. 367,132 So.2d 758 (1961). While the best course may have been to exclude the lunacy report, we find its inclusion to constitute harmless error. Rule 45, Alabama Rules of Appellate Procedure. *Page 32 Benton and Moody, supra, held it not to be error for the trial court to exclude a lunacy report from evidence in the trial.
Those cases do not hold it to be error to allow a jury in a lunacy inquiry to consider such a report. Certainly the report would be inadmissible on a trial on the guilt or innocence of the accused, however, in the inquiry concerning his competency to stand trial, the report would have insufficient prejudicial effect to support a reversal.
At the competency hearing, during which the lunacy report was introduced, the chief authors of the report were called as witnesses. The witnesses were submitted to a thorough cross-examination regarding the contents of the lunacy report. The report on the whole appears to be much more favorable to the appellant than the actual testimony of the witnesses who prepared it.
Although the above factors tended to negate the prejudicial effect caused by the introduction of the lunacy report, our prime reason for holding the introduction harmless stems from the nature of the proceeding in which the report was introduced. It was introduced at a hearing to determine only the appellant's competency to stand trial. A sufficient showing was made by the appellant to call into question his competency to stand trial. It was then the ultimate responsibility of the trial court to make certain that the appellant was able to understand the charge against him and that he was able to aid in his own defense. Pate v. Robinson, 383 U.S. 375,86 S.Ct. 836, 15 L.Ed.2d 815 (1966); Seibold v. Daniels, 337 F. Supp. 210
(1972).
The trial court, mindful of the pitfalls of the hearsay contained in the lunacy report and unprejudiced by the statement of Dr. Rudder, undoubtedly would have disregarded the jury's finding of competency had he perceived the finding to be erroneous. Seibold, supra. Benton and Ex parte Moody, supra, dealt with the actual trials and not with competency hearings. Those cases were affirmed in spite of the trial court'sexclusion of lunacy reports introduced by the defendants. The precedential value of Benton and Ex parte Moody to the present case is at best slight. We should not be understood to imply that erroneous rulings which are deemed harmless in the milieu of a competency hearing would also be harmless at a trial on the merits to determine guilt or innocence. We have reviewed the record of the competency hearing, and we are of the opinion that the State put on sufficient evidence upon which the jury, and more importantly, the trial court could reasonably base a finding that appellant was competent to stand trial. Morton, supra.
 II
The appellant contends that his shotgun should not have been admitted into evidence because it was the product of an illegal search and seizure. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684,6 L.Ed.2d 1081 (1961).
During the week immediately following the shooting, the police became aware of the possibility that the appellant might be involved in the murder. By January 21, 1975, the possibility became a probability. The appellant's house was surrounded and at approximately midnight on January 21, 1975, several law enforcement officers, including the Mobile County District Attorney, sought to gain entrance to the appellant's home. The record is in conflict as to their opportunity to obtain a search warrant.
Although the record is conflicting, the trial court could have reasonably believed the following: that the law enforcement officers asked the appellant's parents for consent to search the house for a shotgun; that the appellant's step-father orally consented and signed a consent form; that the appellant's step-father personally retrieved the shotgun for the law enforcement officers; that the appellant and his parents were not coerced into consenting to the search.
Whether the consent was voluntary must be determined from the totality of the circumstances. Schneckloth v. Bustamonte,412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 *Page 33 
(1973). Where the evidence is conflicting as to the presence of the voluntary consent, it is the trial court who is in the best position to determine consent or lack thereof. Liptroth v.State, Ala.Cr.App., 335 So.2d 683, cert. denied Ala.Cr.App.,335 So.2d 688 (1976). Here the trial court believed the evidence presented by the State on the motion to suppress the shotgun. A review of the record leads us to conclude that the trial court's belief was not erroneous.
 III
After the appellant's arrest on the night of January 21, 1975, he was taken to police headquarters. The appellant was given the appropriate Miranda warnings which he indicated he understood. He then stated that the shotgun was his and that it had remained in his possession from the time of purchase. The appellant contends that the above statement was not the product of a rational intellect and a free will, therefore, he contends the trial court erred in allowing the statement into evidence.Beecher v. Alabama, 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317
(1972); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281,1 L.Ed.2d 246; Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202,3 L.Ed.2d 1265 (1959); Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274,4 L.Ed.2d 242 (1960).
The trial court conducted an extensive hearing outside the presence of the jury regarding the admissibility of the appellant's statement. The testimony of the experts who testified at the sanity inquisition was incorporated into the hearing. The opinion of the appellant's experts was that the appellant's statement was not the product of a rational intellect and a free will. The State's experts did not appear to have an opinion on this point. The State relies on the testimony of two of the interrogating officers. The portions of their testimony which are favorable to the State are as follows:
 "Q. Did Mr. Holmes appear, in your judgment as a professional police officer, to be fully aware of what was going on that night?
 "A. [Chief Frank P. Pridgen, Jr.] I'm not certain that I can answer that because in my duties, I've seen many people, and may people react differently; and what is normal and what might be for one person to be aware might not be normal for another person to be aware. So I am really not in a position to say whether or not — as far as I know, I had never seen Mr. Holmes before that night; I might have, but as far as I know, I never have; and I do not know how he should act normally.
 "Q. Yes, sir. So would it be fair to say you really don't have an opinion as to whether or not he was fully aware of what was going on that night?
"A. Well, now, I do.
 "Q. You do not? I want to make sure I hear you correctly.
 "A. Well, you're asking, Mr Brown, to look into the man's mind and know what he's thinking; this I can't do.
 "Q. Well, then would it be a fair statement to say that you did not form an opinion as to whether or not he was fully aware of what was going on around him that night?
 "MR. GRADDICK: Judge, the witness just said it was impossible for him to look into the man's mind and tell what he was thinking. He's answered the question three times in a row.
 "THE COURT: Without going into his mind, Chief, can you describe his outward appearance that would give us any assistance as to whether or not he seemed to be conversant with you — what you outwardly observed? Is that all right, Mr. Brown?
"MR. BROWN: Yes, sir, Judge.
 "A. I would think that he understood what was going on because when he was told the nature of the charge against him — before I completed making the statement to him about the nature of the charge, when I told him that he was under arrest, he looked at me and said, `for what?' So I would assume by that that he did understand what I was saying, and I stated to him that he was *Page 34 
under arrest for murder. But he asked me, `For what?'; so I assume that he understood.
* * * * * *
"Q. What type of questions did you ask him?
 "A. [Officer Walter Pickett] I asked him did he understand his rights and all; and I asked him about the murder. He looked at me, you know; he didn't respond one way or the other — he just looked at me. And then I asked him through the interrogation, I asked him also if he did, why, you know. He would go off and seemed to me as though he would appear in some other world, I would say; and then he would come back and, you know, I would ask him some more questions. He never would answer any specific question I asked. It got to the point where at one time he got in a conversation — I asked him why, again, you know — if he did it, why; and he told me that he had some confrontation while he was in Service with some white officers and they mistreated him and he didn't like white people.
 "Q. All right. And you stated that he would just seem to go off in another world for a while and come back, is that correct?
 "A. He showed no emotion, in my opinion, of a man, you know, being charged with murder.
"Q. Did he seem to be in touch with reality?
 "MR. GRADDICK: I object — `did he seem to be in touch with reality?'
 "THE COURT: Ask him if he seemed to understand what was going on around him.
 "MR. BROWN: Did he seem to understand what was going on?
 "A. At times he would, in my opinion; and at other times seemed like he wouldn't — that he wasn't with us or he didn't care or something; he gave that impression.
* * * * * *
 "MR. BROWN: Officer Pickett, have you ever expressed an opinion to me as to whether or not the defendant was in control of his faculties on that night?
 "A. Yes, sir, we had a conversation and you asked me my opinion about it.
"Q. And what was that opinion?
 "A. I told you that in my opinion I thought he was crazy.
* * * * * *
 "Q. And in answer to the question of Mr. Brown where he said you had voiced your opinion to him that you felt like the man was crazy —
 "A. Yes, sir, I said that — maybe I can qualify just a little bit why I said that —
 "MR. BROWN: Objection, Your Honor; that's not responsive to the question.
 "MR. GRADDICK: All right, let me ask you the question; would you tell us what you mean by what you said — how you determined and formed your opinion as to this man being crazy.
 "A. Well, it's been my experience — this man was charged — picked up on a charge of murder and when you talk to him about it, he don't respond, he don't show no emotions, he don't show anything; and this is why I would gather this opinion about him because it's been my experience that over the years people would show some type emotion — would respond one way or the other.
* * * * * *
 "Q. One final question, Walter; tell the Judge whether or not on the questions he answered, whether or not you felt like he completely understood what he was doing, and if he was rational and competent and gave a competent —
* * * * * *
 "WITNESS: Actually the questions that he answered, they were answered in such way that he appeared to know what he was talking about."
We are convinced from the record that the appellant understood his Miranda warnings. We are also convinced that the appellant was neither coerced nor induced into making the incriminating statement. *Page 35 
The present case is easily distinguishable from Spano andBeecher, supra, upon which the appellant relies. In Beecher, gross coercion was used to obtain a confession. In Spano, the police ignored the defendant's requests to contact an attorney whom he had retained, and they continued to question the defendant for approximately eight hours until they obtained a confession. In addition, the police made false statements to the defendant designed to obtain a confession.
In Fikes, supra, the defendant was taken to a state prison after his arrest. He was not taken before a magistrate as required by law, and he was kept in isolation, except for sessions of questioning which lasted several hours at a time. His lawyer and his father were prevented from seeing him. Likewise in Blackburn, supra, the defendant confessed after eight to nine hours of sustained interrogation in a tiny room which was literally filled with police officers. He did not have the presence of family or counsel. The defendant also signed a confession prepared by a deputy sheriff.
In all the cases cited by the appellant, the use of coercion
by the police played a part in those cases being reversed. Here we have no coercion. Those cases dealt with confessions which were extracted like wisdom teeth from the defendants. Here, in the face of rather constrained questioning, the appellant made an incriminating statement while maintaining his innocence of the charge. Whether a confession is voluntarily given as a product of a rational intellect and a free will is a question to be determined from the totality of the circumstances. Fikes, supra. The trial judge was in the best position to determine voluntariness as he had ample opportunity to observe the appellant, and his decision will be reversed only if palpably erroneous. Stewart v. State, 49 Ala. App. 681, 275 So.2d 360
(1973). Given the lack of coercion; given the appellant's understanding of his Miranda warnings; and given the context in which the incriminating statement was made, we hold that the trial court's ruling was not palpably erroneous. Mitchell v.State (1976), Ala.Cr.App., 338 So.2d 524. We hasten to note that this is an extremely close question and that in future cases with slight factual distinctions, similar admissions may be considered to be inadmissible.
 IV
The appellant contends that the trial court erred in refusing to give the following requested jury charge:
 "The Court charges the jury that should you find from the evidence that the defendant did in fact kill the deceased, but that at the time of the defendant's act, as a result of mental disease or defect he lacked substantial capacity either to appreciate the criminality or wrongfulness of his conduct or to conform his conduct to the requirements of the law, then you must find the defendant not guilty by reason of insanity."
The above charge was based on the American Law Institute's test of insanity which is used in a substantial minority of American jurisdictions. United States v. Freeman, 357 F.2d 606 (2d Cir. 1966). The trial court refused the appellant's written charge and gave an oral charge based on M'Naghten's Case, 8 Eng.Rep. 718 (H.L. 1843) as supplemented by Parsons v. State, 81 Ala. 577,2 So. 854 (1886). We have only recently reaffirmed our adherence to Parsons in the face of an attack similar to the appellant's. Johnson v. State, 56 Ala. App. 105, 319 So.2d 725
(1975). Although the appellant's counsel has made a very persuasive argument regarding the lack of merit in theM'Naghten test in view of modern medical knowledge, we cannot overturn Parsons and Johnson. Christian v. State (Ms. August 31, 1976), Ala.Cr.App. The task of instituting new tests for insanity rests with the Alabama Supreme Court or the legislature.
 V
During the cross-examination of the appellant's mother by the District Attorney, the appellant leaped to his feet, shouted "Put me on the stand," and grabbed his defense counsel around the throat. The authorities immediately seated *Page 36 
the appellant and the trial continued. The appellant's action in all probability was prejudicial to his cause. Appellant's counsel moved for a mistrial which was denied. The appellant now contends that the trial court erred in denying the motion for a mistrial.
One cannot purposefully create grounds for mistrial by deliberately causing a disturbance during trial. Hayes v. State
(1976), Ala.Cr.App., 340 So.2d 1142; Illinois v. Allen,397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The trial judge in the present case acted in a judicious and completely proper manner. We find no error on his part in denying the motion for a mistrial.
 VI
The appellant's final contention concerns the questions asked by the trial court in the jury selection process. The appellant's counsel prepared numerous questions which were intended to determine if the prospective jurors were free from racial prejudice and free of bias against pleas of insanity. The appellant's counsel sought assurance on these two points because his client, a black man, was charged with a senseless, motiveless shotgun slaying of a white man that he apparently did not know. The trial court did not ask the prospective jurors the more objective questions requested by the appellant's counsel. He did, however, ask the following two questions:
 "E. Is there any juror who has any abiding conviction or any basic feeling that you would prohibit or make it difficult for you to accept the principle that in a Court of law all persons are judged equally regardless of race, color or creed? Is there anyone who feels that you have any private belief, or any religious belief, or any moral belief that would make it difficult for you to accept the legal principle that all persons are adjudged equally, regardless of race, color or creed? If so, you owe it to yourself, and you owe it to us, to stand and make those views known at this time. (No response.)
* * * * * *
 "G. On Question 21 (requested by defendant), on the Doctrine of Insanity — I meant to ask you that, but I again ask you that if the Court gave you a legal and medical test as to what would constitute sanity or insanity, would you find it difficult to accept the test that the Court gave you; or is there anyone of you would not be able to follow that test in determining whether to find a man not guilty by reason of insanity? (No response.)"
The trial court has broad discretion in conducting the voir dire examination of prospective jurors. Clark v. State,294 Ala. 493, 318 So.2d 822, cert. denied 423 U.S. 937,96 S.Ct. 298, 46 L.Ed.2d 270 (1975); Powell v. State, 53 Ala. App. 30,297 So.2d 163 (1974). In the present case, the trial court conducted an extensive examination of the prospective jurors. Many of the questions requested by the appellant may have been beneficial in selecting a jury, however, we do not find that the trial judge abused his discretion in refusing to ask every question requested by appellant.
AFFIRMED.
All the Judges concur.