On June 4, 1983, Ronald Harvey Wesley shot and killed his sister-in-law, Nikita Jackson, and his two-year-old daughter, Lorraine Wesley. He was convicted of capital murder and sentenced to death by electrocution pursuant to Ala. Code 1975, § 13A-5-40(a)(10). He raises three issues on this appeal from that conviction. *Page 109 
 I
Wesley contends that the trial court committed error in allowing the prosecution's expert witness to state his opinion of Wesley's sanity at the time of the crime, when that opinion was based in part upon interviews with witnesses of the crime, upon Wesley's military and medical records, which were not introduced into evidence, and upon the tests and reports of other psychologists and psychiatrists.
Wesley's defense was legal insanity. At trial, he presented the testimony of both a psychologist (Dr. C. Van Rosen) and a psychiatrist (Dr. Claude L. Brown) tending to show that, at the time of the killings, Wesley was suffering from paranoid schizophrenia, was psychotic, and could not appreciate the criminality of his conduct.
In rebuttal, the prosecution also presented the testimony of both a psychologist (Dr. Harry Elbert McClaren) and a psychiatrist (Dr. Kamal Nagi). Dr. McClaren testified that he was a forensic psychiatrist; that he examined Wesley on several occasions at the Taylor Hardin Secure Medical Facility in 1984 and 1985, where he then served as chief of psychology; that he interviewed Wesley on August 17 and 18, 1988, in preparation for trial; that he reviewed the police file in this case; that he interviewed certain witnesses and surviving victims of Wesley's actions of June 4, 1983; that he reviewed Wesley's military records; that he reviewed the results of an examination by Dr. Rosen; and, that he reviewed Wesley's entire file from the Taylor Hardin Secure Medical Facility, "including the evaluation done by social workers, other psychiatrists, psychologists, nurses, physicians there."
The factual basis for Wesley's argument on appeal occurred during the district attorney's examination of Dr. McClaren. From the record:
 "Q [District attorney]: Doctor, based on your expertise as a forensic psychologist, based on your evaluation of Ronald Wesley, based on you review of the entire record and your observations at Taylor Hardin, based on your review of the collateral data, which included the police reports, which neither Dr. Brown nor Dr. Rosen looked at, and the witnesses interviews which you did, but which again they did not do, do you have opinion within a reasonable medical certainty as to whether Ronald Wesley in June 4th, 1983 could appreciate the criminality of his conduct?
 "MR. TOLER [defense counsel]: Your Honor, I object to the question. It's based upon numerous matters that are not in evidence, that — various hearsay statements —
 "THE COURT: The only thing I see wrong about it, you're asking him about a medical certainty and he's not a medical doctor.
"To that extent, I sustain the objection.
 "MR. GALANOS [district attorney]: All right. Well, let me rephrase the question.
 "Q Based on all of the foregoing, witness interviews, review of police records, review of Taylor Hardin record, interviews with the Defendant, review of his records at Taylor Hardin, and your expertise, do you, sir, have an opinion as to whether or not Ronald Wesley on June 4, 1983, could appreciate the criminality of his conduct?
 "MR. TOLER: Again I object to the question on the grounds that a number of the bases that Mr. Galanos is referring to, being the police reports, interviews with various and sundry witnesses, are hearsay and are not evidence in this court at this point and as such the opinion would be improper.
"THE COURT: Overruled.
"You can answer it.
"Q Doctor, do you have an opinion?
"A Yes, I do.
"Q What is your opinion?
 "A I think that he could appreciate the criminality of his behavior on that day."
In his oral instructions to the jury, the trial judge stated:
 "As I have said and as you know, expert witnesses have in fact testified in this case and have been permitted to express an opinion and to draw their *Page 110 
conclusion. In passing upon the facts, again, you are not required to accept the conclusion or expressed opinions of expert witnesses, but you must determine for yourself the weight to be given to such testimony and evidence, when considered in connection with all the other evidence material to the issues in this case. Now, the witnesses who have testified in this case as experts, again, have expressed opinions based upon assumed facts which were set forth in hypothetical questions as presented by the lawyers to them. The weight to be accorded such is dependent entirely upon the truth of the material facts stated in these hypothetical questions. Before considering the opinions of the experts you should first examine carefully all the material facts stated in these hypothetical questions and be reasonably satisfied that they have substantially been proven to be true."
In dealing with this issue, this court would be remiss if it did not include the following facts. In his written order upon imposition of the death penalty, the trial judge attached "great significance to the credibility" of Dr. McClaren.
 "Dr. McClaren bases his opinion that the defendant could appreciate the criminality of his conduct and conform it to the requirements of law on an array of data not utilized by Dr. Rosen and Dr. Brown. Dr. McClaren not only testified and interviewed the defendant, he reviewed the investigative reports and personally interviewed several of the key witnesses. For these reasons, the Court attaches more weight to the testimony of Dr. McClaren."
The traditional rule in Alabama "has been that an expert, in giving his opinion, cannot rely upon the opinions of others," because "such testimony is based upon what others have said and, consequently, constitutes hearsay." C. Gamble,McElroy's Alabama Evidence, § 110.01(3) (3d ed. 1977). "The opinion of a medical expert as to the sanity of a defendant in a criminal proceeding based partly upon the statements of third persons out of court is generally considered inadmissible." Annot., 175 A.L.R. 274 at 287 (1948). See also Free v. State,495 So.2d 1147, 1159 (Ala.Cr.App. 1986) (objection to psychiatrist's testimony on the ground that it was based on hearsay evidence of the members of the psychiatric evaluation team was without merit where the "objectionable question posed to Dr. Salillas was rephrased to conform to the observations and evaluations made specifically by Dr. Salillas").
"[W]itnesses, including medical witnesses, cannot testify to facts of which their knowledge is derived from the unsworn statements of others." Hurst v. State, 356 So.2d 1224, 1236
(Ala.Cr.App. 1978) (psychologist not permitted to testify concerning what the record of the defendant's past medical history revealed). See also Drexler v. Seaboard SystemRailroad, 530 So.2d 754, 757 (Ala. 1988) (expert testifying to the present value of future wages could not base his testimony on information he obtained by telephoning a library); Wang v.Bolivia Lumber Co., 516 So.2d 521, 523 (Ala. 1987) (therapist's report could not be introduced into evidence through the testimony of a physician). In Welch v. Houston County HospitalBoard, 502 So.2d 340, 345 (Ala. 1987), the Alabama Supreme Court held that the opinion of the attending physician that the decedent was not given the wrong drug by the hospital "would be inadmissible, inasmuch as it is an expert opinion based on facts (i.e., hospital records and unverified statements of hospital personnel) not in evidence and not within Dr. Smith's personal knowledge." A psychologist is properly prohibited from testifying to the results of tests administered by another psychologist at the request of the witness-psychologist.Brackin v. State, 417 So.2d 602, 605-06 (Ala.Cr.App. 1982).
"[W]hen a witness is duly qualified as an expert, . . . then he may base his opinion upon either facts of which he has firsthand knowledge or facts, in evidence, which are assumed in a hypothetical question asked of him. His opinion must be based upon facts and not upon opinions or conclusions of others."Chinevere v. Cullman County, 503 So.2d 841, 843 (Ala. 1987). "[I]t is axiomatic that an expert may base his opinion *Page 111 
not only on facts of which he has firsthand knowledge, but also on facts that are assumed in hypothetical questions,Armstead v. Smith, 434 So.2d 740 (Ala. 1983), provided that the facts, either known to the expert or hypothesized to him, are in evidence, Romine v. Medicenters of America [Inc.],476 So.2d 51 (Ala. 1985), or will come into evidence at a later time in the trial, Belcher v. Versatile Farm Equipment Co.,443 So.2d 912 (Ala. 1983)." Phillips v. Emmons, 514 So.2d 1369, 1371
(Ala. 1987). "[E]xpert opinions based on facts not in evidence or within the expert's personal knowledge are inadmissible."Id. at 1372. In Phillips, the Alabama Supreme Court held inadmissible the opinion of a state trooper as to the cause of an accident where "[h]is opinions were based in part on assumedmental processes and conclusions of both drivers that could not have been derived from his observations of the physical scene."Id. at 1371 (emphasis in original). However, it was specifically noted that "[o]n cross-examination, Trooper Myrick conceded that he did not form his opinion as to the cause of the accident based on conversations with the parties or witnesses to the accident." Id. at 1372.
It must be recognized that there is a "strong case law trend" toward permitting the admission of expert testimony based, in part at least, on hearsay. E. Cleary, McCormick on Evidence
§ 15 (3d ed. 1984); McElroy, at § 110.01(3); Annot., 55 A.L.R.3d 551 (1974); Federal Rules of Evidence, Rule 703. See alsoSalotti v. Seaboard Coast Line Railroad, 293 Ala. 1, 25,299 So.2d 695, 717 (1974) (Jones, J., concurring); P. Rheingold,The Basis of Medical Testimony, 15 Vand. L. Rev. 473 (1962) (as reprinted with additions by the author in 1 Examination ofMedical Experts 1 (1968)); Comment, The Admissibility ofExpert Medical Testimony Based in Part Upon InformationReceived From Third Persons, 35 So.Cal. L. Rev. 193 (1962);
 "A question calling for a direct opinion based upon firsthand knowledge of an expert is so direct, simple, and thus effective that a party may for similar reasons desire to obtain an opinion based upon reports of others. There formerly was a majority view, however, that a question is improper if it calls for the witness' opinion on the basis of reports that are not in evidence or are inadmissible in evidence under the hearsay rule (without reciting their contents as hypotheses, to be supported by other evidence as to their truth). The essential reason in support of this view seemed to be that the jury was asked to accept as evidence the witness' inference, based upon someone's hearsay or upon other inadmissible facts which were presumably not supported by any evidence at the trial and which therefore the jury had no basis for finding to be true. Want of knowledge could also be asserted. This view was also taken when the witness was asked to give a similar direct (not hypothetical) opinion, not merely on the basis of reports, facts and data of this kind, but on these matters supplemented by the witness' own observation of the person or matter in question. However, in this latter situation there has been a strong case law trend toward a contrary view. (There is also a suggested view that opinions based upon hearsay should be less objectionable if they are opinions upon subject matters that have an indirect relation to the fact issues in the case, rather than opinions directly concerning the facts in issue.) The above trend was another trend in the area of evidence law which culminated in a broader view in Federal Rule of Evidence 703, which has been adopted in various state jurisdictions. Of course, under Rule 703 (and Rule 705) an expert may give a direct opinion upon facts and data, including reports, which are inadmissible or not introduced into evidence, provided the reports or other data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' "
McCormick, at § 15 (footnotes omitted).
Apparently, coexisting with the Alabama rule prohibiting an expert opinion based upon the findings and statements of others and upon records not in evidence is a line of cases admitting an expert opinion based in *Page 112 
part on hearsay where the hearsay is used only to prove the basis of the expert's opinion. The most recent in this line of cases is Brown Mechanical Contractors, Inc. v. CentennialInsurance Co., 431 So.2d 932 (Ala. 1983). That case involved an action for declaratory judgment brought by the insurers to determine their coverage obligation resulting from a fire to a partially built tower. A city fire marshal concluded from his investigation that the fire was caused by sparks from a welding torch. He rejected cutting work with an acetylene torch as a cause for the fire based upon the time at which that work was completed as revealed to him in a letter from one of the subcontractors. The Alabama Supreme Court held that the letter was properly admitted into evidence.
 "We find that the letter did not operate as hearsay evidence, because . . . the letter was offered to show the basis of [Fire Marshal] Reynolds's expert opinion. Although his opinion may have been subject to impeachment for lack of adequate factual basis,[6] the trial court had discretion to admit the letter for its limited purpose.[7]
Brown, 431 So.2d at 944 (emphasis in original).
In other cases, an expert has been permitted to testify even though his opinion was based in part upon hearsay. SeeHollis v. Scott, 516 So.2d 576, 580 (Ala. 1987) (automobile accident reconstruction expert could testify to point of impact without aid of hypothetical question where he investigated the scene of the accident, made measurements at the scene, confirmed depiction of the scene and markings with the police, and inspected the vehicles involved); Hagler v. Gilliland,292 Ala. 262, 265-66, 292 So.2d 647, 648-50 (1974) (expert allowed to testify to plaintiff's loss of employability based on his meeting with the plaintiff, the plaintiff's history as recounted by the plaintiff, a report from a medical doctor, and a letter from the plaintiff's attorney); Sidwell v. Wooten,473 So.2d 1036, 1038-39 (Ala. 1985) (accountant properly allowed to testify regarding the content of leases which he had not examined but of whose contents he had been told, because his testimony was not admitted to prove the contents of the leases, "but rather was offered to demonstrate the amounts he used to obtain his damage estimates"); McLaney v. Turner, 267 Ala. 588,599-600, 104 So.2d 315, 324 (1958) (physician allowed to testify to what patient told him concerning road conditions at time of accident to establish basis for physician's opinion).
Citing Brown, supra, one authority has reached the following conclusion.
 "In Alabama, an expert must testify based on reasonable inferences from the facts and may not engage in speculation or conjecture. Although an expert cannot base his opinion substantially on the conclusions of others, Alabama permits experts to base their opinions on hearsay as long as it is hearsay that is customarily relied on by experts and which is likely to be trustworthy. Thus, opinions as to value, as well as opinions on other matters, may be premised, at least in part, on hearsay. However, the fact that the opinion is based on hearsay like any challenge to the facts on which an expert bases his opinion, may affect the weight to be given that opinion, and in some cases the hearsay may be introduced into evidence for the limited purpose of showing the basis for the expert's opinion."
W. Schroeder, J. Hoffman, R. Thigpen, Alabama Evidence § 7-3(a) (1987).
We also find authority for the principle that "[t]he fact that, in forming his opinion, the witness considered some irrelevant *Page 113 
matters, goes to the credibility of his testimony, and not to its admissibility." Blount County v. Campbell, 268 Ala. 548,554, 109 So.2d 678, 683 (1959). Accord, Southern ElectricGenerating Co. v. Howard, 275 Ala, 498, 502, 156 So.2d 359, 363
(1963). See also Jackson v. State, 412 So.2d 302, 306
(Ala.Cr.App. 1982) ("[t]he fact that [the deputy coroner] used [the toxicologist's] autopsy report in conjunction with his own personal observations does not render his testimony [as to the cause of death] inadmissible"); Woodard v. State,401 So.2d 300, 303 (Ala.Cr.App. 1981) (coroner's use of toxicology report in conjunction with his own personal observations does not render his testimony inadmissible and subject to the motion to exclude.).
In Mitchell v. State, 58 Ala. 417 (1877), a physician testified that if he had not been informed that the husband of the deceased had arsenic in the house, he would not have concluded that the sickness and death were caused from poison by arsenic. The Alabama Supreme Court held that "certainly this acknowledgement greatly impaired the force of his testimony as evidence against the prisoner, but it was not inadmissible. There was no error in the refusal to rule it out." Mitchell,58 Ala. at 420. Although it has been stated that "[t]his case is probably no longer the law," J. McElroy, 1 The Law of Evidencein Alabama § 110.01 (2d ed. 1959), Mitchell has yet to be overruled.
Testifying at trial before Dr. McClaren testified, defense expert Dr. Rosen admitted on cross-examination, without objection, that he neither interviewed any witness to the crime nor reviewed the police reports. He admitted that such information "would have been of some assistance" and "helpful," but maintained that it would not have changed his opinion. On redirect examination by defense counsel, Dr. Rosen testified that he had "personal knowledge about one of the psychiatrist's [findings]" and that he had seen Dr. McClaren's report. He was then permitted to testify about the reasons for the difference between Dr. McClaren's opinion and his own.
Defense expert Dr. Brown also testified at trial before Dr. McClaren was called to the witness stand. Dr. Brown testified on cross-examination, without objection, that collateral information such as police reports and interviews with witnesses are "always helpful" and that he did not have access to that information in this case.
Here, Dr. McClaren's opinion was based, at least in part, upon hearsay evidence in the form of conversations he had with witnesses to the crime and upon his review of police reports and medical records which were not admitted into evidence. Yet, his opinion was also based on personal observation and examination. "An expert is 'not prohibited from stating his opinion based upon his own investigation and examination.' "Hollis v. Scott, 516 So.2d at 579. From the record it is evident that Dr. McClaren was not merely reciting the opinions of others but was stating his own opinion formed after and based upon his own investigation. In testifying, Dr. McClaren did not express the opinion of any other expert or witness to support his own findings.[1] Dr. McClaren did not reveal the contents of any record or report, with the one exception when he testified without objection that the defendant's "medical record evidence did not reveal a prior history of mental disease or psychological or emotional problems."
Dr. McClaren did not use hearsay sources of information to corroborate his findings, but merely mentioned those sources as part of the basis for his testimony as in the nature of revealing the extent and scope of his investigation. Dr. McClaren merely characterized the various types of information upon which his opinion was based and did not "detail the minutiae of the basis." P. Rheingold in Examination of MedicalExperts, supra, at 8. Dr. McClaren's opinion was not "based partly upon the opinion of another and used for a *Page 114 
hearsay purpose." Armstead v. Smith, 434 So.2d 740, 743
(Ala. 1983) ("[H]is opinion on this important aspect was not based upon facts within his own knowledge or upon a hypothetical question, but was based partly upon the opinion of another and used for a hearsay purpose. That is, the witness himself would have to have believed it to be true in order to reach his opinion based upon it."). Obviously, Dr. McClaren did not "believe" everything contained in the medical records, because his opinion was in conflict with portions of that information.
We find that the trial court did not commit reversible error in permitting Dr. McClaren to testify to his opinion of Wesley's sanity. The fact that the psychologist did consider hearsay material along with his personal observations in forming his opinion of Wesley's mental condition did not render him incompetent as an expert and his testimony inadmissible. It is clear that no single factor or bit of information formed the basis of his opinion. "The question of whether a witness is qualified to render expert testimony is a question traditionally left to the sound discretion of the trial court, and the decision of the trial court will not be disturbed on appeal unless this Court finds that the trial court abused its discretion." Bell v. Hart, 516 So.2d 562, 569 (Ala. 1987).
 II
The second expert witness called during the prosecution's case in rebuttal was Dr. Nagi. He testified that Wesley was suffering from a characterological disorder and not from a mental illness; that Wesley was not psychotic at the time of the crimes, and that he was exaggerating his symptoms to mimic a psychiatric disorder.
On cross-examination, the trial judge sustained the prosecutor's objections and refused to allow defense counsel to question Dr. Nagi about the opinions of other experts who had examined Wesley at Taylor Hardin:
 "Q [defense counsel]: Now are you aware from your records there as to what diagnosis these doctors or psychiatrists [at Taylor Hardin Secure Medical Facility] had given Mr. Wesley when he was first in there?
 "MR. GALANOS [district attorney]: I'm going to object to what the other doctors may have diagnosed. Number one, on the basis that its hearsay, and, number two, that these doctors were accessible to Mr. Toler [defense counsel] as they were to me and he could have subpoenaed them.
"THE COURT: Sustained.
 "Q Are you aware of any differences of opinion that the other professionals at Taylor Hardin may have had other than yours?
 "MR. GALANOS: I'm going to again respectfully object on the grounds that if there were such opinions he could have subpoenaed those witnesses and gotten them and further that is still hearsay.
"THE COURT: Sustained."
The district attorney's objections were properly sustained. "[T]he unsworn opinion of a physician, like [that of] any other expert, is mere hearsay. The proper way of proving the result of [an expert's] examination [is] to examine [the expert] as a witness." Taylor v. Atlantic Coast Line Railroad, 232 Ala. 378,381, 168 So. 181 (1936). An expert witness cannot testify to information obtained from a non-witness expert where that information is not in evidence. See Clark v. Hudson, 265 Ala. 630,635, 93 So.2d 138 (1956); Prince v. Lowe, 263 Ala. 410,413-16, 82 So.2d 606 (1955). "There is no more reason for permitting the unsworn assertions of experts to be detailed second-handed in court than the like testimony of other persons. Each is equally hearsay, within the strictest meaning of the term." Hussey v. State, 87 Ala. 121, 134, 6 So. 420, 425
(1889). See also Wang v. Bolivia Lumber Co., 516 So.2d 521, 523
(Ala. 1987); Central of Georgia Railway v. Reeves, 288 Ala. 121,122-24, 257 So.2d 839, 841-42 (1972); Brackin v. State,417 So.2d 602, 605-06 (Ala.Cr.App. 1982). "[E]xpert witnesses, even physicians, cannot testify to the opinions of others in giving their opinions." Carroll v. *Page 115 State, 370 So.2d 749, 758 (Ala.Cr.App.), cert. denied,370 So.2d 761 (Ala. 1979).
On continuing cross-examination of Dr. Nagi, defense counsel questioned Dr. Nagi about his opinion that Wesley was faking or mimicking symptoms of mental illness. On cross-examination, the following exchange occurred:
 "Q Did you have occasion to talk to all of the various witnesses that may be involved in the case.
"A I don't think we are —
"Q I said did you have occasion —
"A — not allowed, but I don't —
"Q — to talk to them?
 "A This is not part of the evaluation. I am not investigator and I don't play that part either. We are requested or required and ordered by the Court to make a clinical evaluation, depending on our assessment of the patient's behavior before and after and during from the data we have collected from the social history, from social workers and psychological testing. In that case Mr. Wesley refused on several times to take tests because it shows [sic]. Minnesota Multiphasic [Personality] Inventory, this M.M.P.I, can show a person who is faking or not and it showed that he was faking bad, and that's the result one time when I got him to take the test. Eventually he took it and it showed fake and I think it's in your — in the record here. I did not give him the test. A psychologist gave him the test. It showed that he was faking.
"Q What psychologist gave him that test?
 "A Let me — okay, I refer you to the psychological evaluation, psychological test results. Dr. Beverly Bell, Ph.D., psychologist, and —
"Q Okay. Now, Doctor —
"A Okay, do you want me to read you the —
"Q No, sir.
"A Okay."
On redirect examination, the following exchange occurred between the district attorney and Dr. Nagi:
 "Q All right, and then you said that the M.M.P.I. that was taken in Tuscaloosa showed that he was faking?
"A Yeah, that's the — I did not take —
 "MR. TOLER: Objection to what it showed. That would be hearsay.
 "Q What is not hearsay is you asked — or Mr. Toler asked you about the test, which we submit opened the door. I, with leave of Court, would like to know what Dr. Bell did say about that M.M. P.I.
 "MR. TOLER [defense counsel]: Objection to what Dr. Bell did say. It still would be hearsay.
 "THE COURT: You asked him about it. I see nothing wrong with him — the door is open, he can walk in. Go ahead.
 "A M.M.P.I. result, faked bad. Answered false to most of the questions and before he took the test one time he said I will — okay. He refused to take the test and afterwards when he took the test it showed these results.
 "Q That he faked badly and he answered the questions falsely?
"A Yes, you have this copy of the testing."
Defense counsel made no motion to strike or to exclude Dr. Nagi's testimony that Wesley was mimicking.
Under the case authorities we have previously cited, Dr. Nagi should not have been permitted to testify to the results of the M.M.P.I test performed by Dr. Bell, who did not testify as a witness at trial. See also, Pappa v. Bonner, 268 Ala. 185, 192,105 So.2d 87, 93 (1958); Clark v. Hudson, supra; SovereignCamp, W.O.W. v. Brock, 226 Ala. 579, 581, 148 So. 129, 131
(1933); Brackin, 417 So.2d at 605-06. "If, on cross-examination, it is discovered that a witness based his decision on hearsay evidence, then the proper remedy is a motion to exclude that testimony." Woodard v. State,401 So.2d 300, 303 (Ala.Cr.App. 1981). Here, there was no motion to exclude. Even in a capital case, the failure to make the proper objection or motion "weigh[s] against any claim of prejudice."Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.), cert. *Page 116 
denied, Kennedy v. Alabama, 474 U.S. 975, 106 S.Ct. 340,88 L.Ed.2d 325 (1985).
However, here we find no error. In Dean v. State, 54 Ala. App. 270, 307 So.2d 77 (1975), on direct examination, defense counsel questioned his own expert psychiatrist about the tests he had used in evaluating the emotional and mental condition of the defendant. Therefore, the State had a right to cross-examine the expert about the reports and their contents. The state also has a right to pursue the inquiry on cross-examination although such inquiry might not be admissible as independent testimony. . . . The trial court was free of error in allowing the state to cross-examine [the expert] about the reports submitted to him by a consulting psychologist . . . and to read parts of [the psychologist's] reports to the jury."Dean, 54 Ala. App. at 277, 307 So.2d at 83.
 III
Wesley argues that the trial judge committed plain error in charging the jury that he was presumed sane.[2] He asserts that this presumption is impermissible under Sandstrom v. Montana,442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
In his oral charge to the jury, the trial court stated:
 "By law, ladies and gentlemen of the jury, every person over 14 years of age is presumed responsible for his acts. That is to say that every such person has sufficient mental capacity to appreciate that certain types of conduct are criminal or are acts which are against the law and every such person also has sufficient mental capacity to conform his actions and conduct to those requirements of law. This presumption may be rebutted by proof of the plea of not guilty by reason of mental disease or defect by a preponderance of the evidence and it is rebutted if such proof is made to your reasonable satisfaction."
This charge is based on the statutory presumption of sanity found in Ala. Code 1975, § 15-16-2,[3] and substantially tracks the language found in Alabama Pattern Jury Instructions, Criminal, IIID-2 (1980).
The United States Supreme Court has "explicitly h[e]ld that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every factnecessary to constitute the crime with which he is charged." Inre Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073,25 L.Ed.2d 368 (1970) (emphasis added). "Jury instructions relieving States of [the burden of proving each and every element of the charged offense] violate a defendant's due process rights."Carella v. California, 491 U.S. 263, 265, 109 S.Ct. 2419, 2420,105 L.Ed.2d 218 (1989).
The Supreme Court has decided a number of cases involving jury instructions challenged as violative of Winship. These cases essentially fall into one of two categories: (1) those cases where the jury instruction included a presumption which actually operated to relieve the prosecution of proving an element of the charged offense and (2) those cases where the jury was instructed that the defendant had the burden of proving an affirmative defense.
In the first category is the case cited by Wesley,Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450,61 L.Ed.2d 39 (1979). In Sandstrom, the trial court instructed the jury that " '[t]he law presumes that a person intends the ordinary consequences of his voluntary acts.' " 442 U.S. at 513, *Page 117 99 S.Ct. at 2453. Because intent was an element of deliberate homicide, the crime with which the defendant was charged, the Court concluded that this presumption was unconstitutional, for it "had the effect of relieving the State of the burden of proof enunciated in Winship on the critical question of [the defendant's] state of mind." 442 U.S. at 521, 99 S.Ct. at 2458. Such an instruction has been held erroneous even if the jury is also instructed that the presumption is rebuttable. Francis v.Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).
In Carella, supra, the defendant was "convicted of grand theft for failure to return a rented car." 491 U.S. at 264,109 S.Ct. at 2419 (footnote omitted). The jury was instructed that, under California statutes, (1) intent to commit theft was to be presumed where, upon the expiration of a lease, the lessee failed to return personal property within 20 days of the owner's demand therefor and (2) embezzlement of a vehicle was to be presumed where the lessee failed to return the vehicle within five days of the expiration of the lease. The Court held that these presumptions were impermissible.
 "These mandatory instructions directly foreclosed independent jury consideration of whether the facts proved established certain elements of the offenses with which Carella was charged. The instructions also relieved the State of its burden of proof articulated in Winship, namely proving by evidence every essential element of Carella's crime beyond a reasonable doubt."
491 U.S. at 266, 109 S.Ct. at 2420.
Mullaney v. Wilbur, 421 U.S. 684, 701, 95 S.Ct. 1881, 1890,44 L.Ed.2d 508 (1975), involved both a presumption which relieved the state of the burden of proving an element of the charged offense and an affirmative defense which required the defendant to negate that same element. The defendant was charged with murder. The trial court instructed the jury "that 'malice aforethought is an essential and indispensable element of the crime of murder,' " but that "if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation." 421 U.S. at 686, 95 S.Ct. at 1883 (footnote omitted). By "affirmatively shift[ing] the burden of proof to the defendant" with respect to "the critical fact in dispute," i.e., malice aforethought, the state violated the defendant's due process rights. 421 U.S. at 701, 95 S.Ct. at 1890.
However, it is clear that a jury may be instructed in accordance with state law that the burden of proof is upon the defendant to establish an affirmative defense, provided that the affirmative defense "does not serve to negative any [element] of the crime which the State is to prove in order to convict." Patterson v. New York, 432 U.S. 197, 207,97 S.Ct. 2319, 2325, 53 L.Ed.2d 281 (1977). The defendant in Patterson
was convicted of second degree murder. "In New York there are two elements of this crime: (1) 'intent to cause the death of another person;' and (2) 'caus[ing] the death of such person or of a third person.' N.Y. Penal Law § 125.25 (McKinney 1975)."432 U.S. at 198, 97 S.Ct. at 2321 (footnote omitted). However, a defendant is permitted "to raise an affirmative defense that he 'acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse,' " id., in order to reduce the murder to manslaughter. In accordance with New York law, the trial court instructed the jury "that the defendant had the burden of proving his affirmative defense by a preponderance of the evidence." 432 U.S. at 200,97 S.Ct. at 2322.
The Court concluded that Patterson's due process rights hadnot been violated.
 "The crime of murder is defined by the statute . . . as causing the death of another person with intent to do so. The death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further facts are either presumed or inferred in order to constitute the *Page 118 crime. The statute does provide an affirmative defense — that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation — which, if proved by a preponderance of the evidence, would reduce the crime to manslaughter. . . .
". . . .
 ". . . This affirmative defense . . . does not serve to negative any facts of the crime which the State is to prove in order to convict of murder. It constitutes a separate issue on which the defendant is required to carry the burden of persuasion."
432 U.S. at 205-07, 97 S.Ct. at 2324-25 (emphasis added).
The Court reaffirmed the Patterson holding in Martin v. Ohio,480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), and upheld an Ohio statute which requires a defendant to prove the affirmative defense of self-defense. The Court also indicated in Martin, 480 U.S. at 233-34, 107 S.Ct. at 1101-02, that evidence offered by the defendant to establish an affirmative defense should be considered by the jury "in determining whether the state has proved all the elements of the offense regardless of whether the defendant has carried his burden of proof with respect to the affirmative defense." Humanik v.Beyer, 871 F.2d 432, 438 (3d Cir.), cert. denied, ___ U.S. ___,110 S.Ct. 57, 107 L.Ed.2d 25 (1989). Thus, an instruction that the defendant's affirmative defense evidence "could not be considered in determining whether there was a reasonable doubt about the state's case, i.e., that [evidence of the affirmative defense] must be put aside for all purposes unless it satisfied the preponderance standard . . . would relieve the state of its burden and plainly run afoul of Winship's mandate." Martin,480 U.S. at 233-34, 107 S.Ct. at 1102.
Wesley was indicted for the capital offense of "[m]urder wherein two . . . persons are murdered by the defendant . . . pursuant to one scheme or course of conduct." Ala. Code 1975, § 13A-5-40(a)(10). Under § 13A-6-2(a)(1), "[a] person commits the crime of murder if . . . [w]ith intent to cause the death of another person, he causes the death of that person or of another person." Essentially, the elements of the capital offense for which Wesley was indicted are (1) intentionally (2) causing the death of the two victims (3) pursuant to one scheme or course of conduct. See Ala. Code 1975, §§ 13A-5-40(a)(10),13A-6-2(a)(1); Scanland v. State, 473 So.2d 1182, 1185
(Ala.Cr.App.), cert. denied, 474 U.S. 1035, 106 S.Ct. 602,88 L.Ed.2d 581 (1985).
The trial judge correctly charged the jury on each of these elements, including the element of intent. The judge also instructed the jury that the defendant was presumed innocent and that the state had the burden of proving "each and every element of the offense alleged in the indictment" beyond a reasonable doubt. The jury was explicitly instructed to consider all the evidence in determining whether the prosecution had proved each of the elements of the offense beyond a reasonable doubt, and that, in order to convict Wesley, each of these elements had to be proved beyond a reasonable doubt.
In Alabama, sanity is not an element of an offense.[4] Instead, "[i]nsanity is an affirmative *Page 119 
defense which must be proven by the defendant to the reasonable satisfaction of the jury." Cunningham v. State, 426 So.2d 484,490 (Ala.Cr.App. 1982). Accord, Ala. Code 1975, § 15-16-2; Exparte Turner, 455 So.2d 910, 911 (Ala. 1984); Grammer v. State,239 Ala. 633, 637, 196 So. 268, 271 (1940). See also, Ala. Code § 13A-3-1(a), (c) (Supp. 1989) (effective May 13, 1988). InLeland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302
(1952), the Supreme Court upheld an Oregon statute which, similar to Ala. Code 1975, § 15-16-2, required the defendant to prove the affirmative defense of insanity.[5] This holding was reaffirmed in Patterson, 432 U.S. at 204-05, 97 S.Ct. at 2324, where a majority of the Court made it clear that Leland did not run afoul of either Winship or Mullaney. See also Rivera v.Delaware, 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160 (1976).
Like the constitutionally permitted affirmative defenses inPatterson and Leland, our affirmative defense of insanity is an issue which the jury considers only after it finds that the state has proved beyond a reasonable doubt each element of the offense charged, including intent. Insanity is "an issue set apart from the crime charged, to be introduced by special plea and decided by a special verdict." Aldridge v. State,351 So.2d 656, 658 (Ala.Cr.App.), cert. denied, 351 So.2d 658 (Ala. 1977) (quoting Leland, 343 U.S. at 795, 72 S.Ct. at 1006). See alsoHutchens v. State, 45 Ala. App. 507, 517, 232 So.2d 687, 696, writ denied and appeal dismissed, 285 Ala. 755, 232 So.2d 700
(1970). Although "evidence relevant to insanity as defined by state law may also be relevant to whether the required mens rea
was present, the existence or nonexistence of legal insanitybears no necessary relationship to the existence ornonexistence of the required mental elements of the crime."Mullaney, 421 U.S. at 705-06, 95 S.Ct. at 1893 (Rehnquist, J., concurring) (emphasis added).
 "You can be insane yet still be capable of entertaining the subjective desire to kill a human being. But you cannot be convicted of murder if you are so crazy that you kill without knowing what you are doing. (Morris, Madness and the Criminal Law, ch. 2 (1982), explains this distinction.) Thus, if [an accused] was under the delusion that he was shooting two gerbils rather than two human beings, he could not be guilty of murder, but if his delusion took the form of thinking that he had a sacred duty to reduce the human population by two, he could be guilty of murder, at least guilty prima facie, though he might have a defense of insanity. Because a state of mind requirement is part of the prima facie case of murder, even if the defense of insanity were abolished (as Professor Morris among others urges it should be) some insane killers would still escape conviction for murder, because their insanity had prevented them from forming the intent required of a murderer."
Greider v. Duckworth, 701 F.2d 1228, 1236-37 (7th Cir. 1983) (Posner, J., concurring). Cf. Brackin v. State, 417 So.2d 602,604 (Ala.Cr.App. 1982) ("[l]egal insanity does not embrace every kind of mental disease or disorder that renders a person not responsible for his acts"); Moore v. State, 364 So.2d 411, 415
(Ala.Cr.App.), cert. denied, 364 So.2d 416 (Ala. 1978) ("[w]here sufficient mental capacity exists to entertain the requisite criminal intent, neither abnormality nor sub-normality will preclude liability for the commission of a crime").
"The 'presumption of sanity' is really a shorthand expression for the fact that the majority of people are sane and the related *Page 120 
probability that any particular person is sane."Commonwealth v. Robinson, 14 Mass. App. 591, 441 N.E.2d 553,556 (1982). See also Cunningham v. State, 426 So.2d at 487. In this state, the presumption is statutory in nature, Ala. Code 1975, § 15-16-2, and, as the trial court correctly instructed the jury, it is rebuttable. The presumption "relieves the State of any affirmative duty to prove that the defendant was in fact sane and responsible for his actions," Cunningham v. State,426 So.2d at 486, and "prevails until the contrary is established to the reasonable satisfaction of the jury," id. at 487.
However, this presumption relates only to the affirmative defense of insanity. Because sanity is not an element of the capital offense with which Wesley was charged, the presumption of sanity neither relieved the state of its burden of proving any of these elements, compare Sandstrom; Francis; Carella, supra, nor required Wesley to negate one of these elements, compare Mullaney, supra. We therefore conclude, as has the Oklahoma Court of Criminal Appeals, that "[t]his presumption does no violence to the concept of due process of law." Nauniv. State, 670 P.2d 126, 134 (Okla.Cr.App. 1983). See also Walkerv. Butterworth, 599 F.2d 1074, 1079-80 (1st Cir.), cert. denied, 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979);Queen v. State, 189 Ga. App. 161, 375 S.E.2d 287, 290 (1988);Loftin v. State, 180 Ga. App. 613, 349 S.E.2d 777, 779 (1986);State v. Lee, 395 So.2d 700, 702-03 (La. 1981).[6]
Furthermore, "[a]s in Patterson [and Martin], the jury was here instructed that to convict it must find, in light of allthe evidence, that each of [the] elements of the crime of [capital] murder must be proved by the State beyond reasonable doubt and that the burden of proof with respect to these elements did not shift." Martin, 480 U.S. at 233,107 S.Ct. at 1101 (emphasis added). Challenged jury instructions are to be reviewed "in the context of the overall charge." Cupp v.Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368
(1973). Considering the instructions given in this case as a whole, we find no error therein.
 IV
This court has carefully examined the proceedings under review and has found no error or defect which either has or probably has adversely affected any substantial right of the appellant. Rule 45A, A.R.A.P. Our review of the propriety of the death sentence in this case, pursuant to Ala. Code 1975, § 13A-5-53, convinces this court that no error adversely affecting the rights of Wesley was made in the sentencing proceedings, that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence, and that death is the proper sentence in this case.
Specifically, we find that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1). The trial judge, *Page 121 
the prosecutor, and defense counsel are to be commended for the exemplary manner in which this trial and the sentencing proceedings were conducted.
Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. § 13A-5-53(b)(2). In this regard, We consider it appropriate to attach the sentencing order of the trial judge as an appendix to our opinion. In that order, the trial judge found that Wesley "purposefully and deliberately embarked on a murderous, assaultive rampage that resulted in the intentional killings of two people, the wounding of an additional three people, and an attempt to murder a police officer." The trial judge found the existence of only one aggravating circumstance: "The defendant knowingly created a great risk of death to many persons." §13A-5-49(3). We agree with the trial judge that "[t]he intentional, indiscriminate, and repeated discharge of a firearm in a residential area [by Wesley] irrefutably create[d] a great risk of death to many persons," and that "[t]he number of victims who were murdered, shot, and shot at by the defendant — seven — is undeniable proof that the defendant created a great risk of death to many persons."
The trial judge found the existence of one statutory mitigating circumstance: "The defendant has no significant history of prior criminal activity." § 13A-5-51(1).
With regard to the mitigating circumstances defined in §13A-5-51(2) (that "[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"), and § 13A-5-51(6) (that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"), the trial judge carefully articulated the reasons why he found that those mitigating factors were not present in this case. The written order of the trial judge demonstrates that the trial judge considered all of the evidence offered to establish these statutory mitigating circumstances and then rejected that evidence as not only insufficient, but as "disproven" by other evidence. The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict. See Ex parteJones, 520 So.2d 553, 555 (Ala.), cert. denied, 488 U.S. 871,109 S.Ct. 182, 102 L.Ed.2d 151 (1988) ("[a]lthough . . . a victim to the crime . . . testified that he thought Jones was intoxicated and that he heard Arthur Giles tell Jones what to do, we find that it was not improper for the trial court to conclude that these did not constitute mitigating factors under the circumstances"). See also Puiatti v. State, 495 So.2d 128,132 (Fla. 1986) ("the trial court considered the mitigating factors . . . but concluded they failed to rise to a sufficient level to be weighed as mitigating circumstances"). Cf. Ex parteCochran, 500 So.2d 1179, 1187 (Ala. 1985), cert. denied,481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1986) ("[t]he trial judge's order does not state whether he considered the evidence offered by defendant and then determined that it was insufficient or whether he merely precluded it without consideration"); Clisby v. State, 456 So.2d 99, 102
(Ala.Cr.App.), affirmed after remand, 456 So.2d 102
(Ala.Cr.App. 1983), affirmed, 456 So.2d 105 (Ala. 1984), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985) ("[f]rom the trial judge's written findings, we cannot determine whether he considered the defendant's mental deficiency as a mitigating circumstance and then determined that the degree of mental disability was simply insufficient to support those mitigating circumstances defined in Section 13-11-7(2) and (6), or whether he merely decided that the defendant's mental disability could not be considered as a mitigating circumstance as a matter of law because it did not measure up to the statutory standard").
We distinguish this case from Magwood v. Smith,791 F.2d 1438, 1449-50 (11th Cir. 1986). There, the appellate court concluded that the trial court erred in rejecting the two mental condition mitigating factors where all the experts agreed that Magwood "suffered from some form of serious mental disorder on the date of Sheriff Grantham's *Page 122 
murder and none testified that Magwood was free from mental illness on that date." Magwood, 791 F.2d at 1450.
The trial court found the existence of several non-statutory mitigating circumstances: "the defendant served in the United States Marine Corps, received a medical discharge with a disability pension, and he began to abuse alcohol and drugs after his discharge from military service." The trial judge also gave "very serious consideration and substantial weight" to the jury's advisory verdict recommending a sentence of life imprisonment without parole.
In engaging in the independent weighing of the aggravating and mitigating circumstances, this court is especially sensitive and proceeds with considerable caution where the trial judge has rejected the advisory verdict of the jury. SeeEx parte Tarver, 553 So.2d 633 (Ala. 1989) (Maddox, J., concurring specially). Here, we conclude that the trial judge was justified in reaching the conclusion that jury override was appropriate and that a sentence of death should be imposed. Our independent consideration of all of the circumstances of this particular case convinces this court of the propriety of the death penalty in this case.
Finally, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. § 13A-5-53(b)(3). In reaching this conclusion, we have compared the facts of this case with those of other cases in which the death penalty has been imposed involving murder wherein two or more persons were murdered pursuant to one scheme or course of conduct. Cf. Daniels v. State, 534 So.2d 628 (Ala.Cr.App. 1985), affirmed, 534 So.2d 656 (Ala. 1986), cert. denied,479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987), affirmed after remand, 534 So.2d 658 (Ala.Cr.App. 1987), affirmed,534 So.2d 664 (Ala. 1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884,102 L.Ed.2d 1007 (1989); Hill v. State, 455 So.2d 930
(Ala.Cr.App.), affirmed, 455 So.2d 938 (Ala.), cert. denied,469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984); Tomlin v.State, 443 So.2d 47 (Ala.Cr.App. 1979), affirmed, 443 So.2d 59
(Ala. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160,80 L.Ed.2d 545 (1984), affirmed after remand, 516 So.2d 790
(Ala.Cr.App. 1986), affirmed, 516 So.2d 797 (Ala. 1987). See alsoBeech v. State, 439 So.2d 1331 (Ala.Cr.App. 1983) (life without parole).
After performing the review specified in § 13A-5-53, after searching the proceedings for plain error, and after addressing the issues raised on this appeal, we find that the judgment and sentence of the circuit court are due to be affirmed.
AFFIRMED.
All Judges concur.
 APPENDIX In the Circuit Court of Mobile County, Alabama State of Alabama vs. Ronald Harvey Wesley CC 83-2501-FDM SENTENCING ORDER
The defendant, Ronald Harvey Wesley, was indicted by the August 1983 Session of the Mobile County Grand Jury. The indictment alleged the intentional killings of Nikita Jackson and Lorraine Wesley pursuant to the same scheme or course of conduct in violation of § 13A-5-40(a)(10) of the Code ofAlabama (1975). After a jury trial, the defendant was found guilty as charged in the indictment, and following a sentencing hearing, the jury returned an advisory verdict recommending that the defendant's punishment be fixed at life imprisonment without parole.
On October 20, 1988, the Court received and considered a pre-sentence report, which the Court had ordered to be conducted pursuant to § 13A-5-47(b) of the Code of Alabama
(1975), and further heard arguments from the defendant and from the State of Alabama as to the proper sentence to be imposed as also mandated by § 13A-5-47. *Page 123 
 II. Facts Summarizing the Crime
The Court finds beyond a reasonable doubt that on June 4, 1983, the defendant purposefully and deliberately embarked on a murderous, assaultive rampage that resulted in the intentional killings of two people, the wounding of an additional three people, and an attempt to murder a police officer.
On that date, the defendant burst into his mother-in-law's residence on Palmetto Street in Prichard where, pursuant to the same scheme or course of conduct, he murdered his two year old daughter, Lorraine Wesley, and his sister-in-law, Nikita Jackson. The child was shot in the back as she lay on a bed, and Nikita Jackson was shot in the head.
After committing these two murders, the defendant emerged from the residence on Palmetto Street and randomly fired at innocent passersby, including Priscilla Fisher Brazeal and her sister, who were driving down Palmetto Street. Ms. Brazeal was injured, but her sister managed to escape physical harm.
From Palmetto Street, the defendant directed his friend, Rudolph Pugh, to drive him to the home of Geralyn McMillan, on Gehrig Street in Prichard. Ms. McMillan was a former girlfriend and the mother of one of the defendant's daughters. He walked into her home, and, as she sat in the presence of four children, shot her in the chest. Her wound was not fatal.
The defendant then directed Pugh to drive from Prichard to south Mobile County, instructing him en route to stop at a package store so he could buy beer. After stopping at the home of Mynell Baker to ascertain the location of her son, Freddie, the defendant directed Pugh to drive him to the home of Mr. Baker. After stating "I just shot three damn people", the defendant went back to his car, retrieved his pistol, and proceeded to shoot Mr. Baker and his wife, Louise. Their wounds were not fatal.
The defendant and Pugh then drove north toward the City of Mobile. After they were observed driving on Highway 90, the defendant ordered Pugh to pull into the parking lot of an automobile dealership and told him to act as if he were repairing a tire as the police followed the suspect vehicle and its occupants into the lot. The officers had previously received a radio dispatch describing Pugh's automobile and its occupants. The similarity of the vehicle and its occupants, which the police personally observed, resulted in the surveillance and ultimate confrontation.
This murderous, assaultive odyssey ended in the lot of the automobile dealership. Pugh, who was already outside his car, was ordered to surrender, which he did without a struggle, while the defendant stayed in the car. The defendant, who had previously told Pugh "I want to be taken out" emerged from the passenger side, drew down, and fired at Officer David Cashman. He missed, but Officer Cashman returned fire, seriously wounding the defendant. Thus the defendant's rampage ended a few hours after it began.
To the allegations in the indictment, the defendant entered the special plea of not guilty by reason of mental disease or defect. The defense and prosecution presented conflicting expert testimony, and the defendant testified in his own defense during the guilt phase.
The experts for the defendant — Dr. Claude Brown, a psychiatrist, and Dr. Clyde Van Rosen, a clinical psychologist — both testified that the defendant was paranoid and psychotic at the time of the murders and could not appreciate the criminality of his conduct.
The defendant, moreover, testified in his own behalf. The Court's assessment of that testimony and its impact on these proceedings is addressed in a subsequent portion of this Order.
The State presented two expert witnesses — Dr. Harry McClaren, a clinical psychologist, and Dr. Kamal Nagi, a psychiatrist — both of whom testified that the defendant could appreciate the criminality of his conduct and conform his conduct to the requirements of law. Dr. Nagi, furthermore, expressed the opinion that the defendant *Page 124 
attempted to fake or mimic signs of mental illness during the evaluation at Taylor Hardin Secure Medical Facility.
 The Aggravating Circumstances
In regard to the aggravating circumstances, the Court finds the following:
(1) The Defendant was not under a sentence of imprisonment when he committed the capital offense. Therefore, the §13A-5-49(1), Code of Alabama (1975), aggravating circumstance does not exist, and it is not considered.
(2) The Defendant has not been previously convicted of another capital offense or of a felony involving the use or threat of violence. Therefore, the § 13A-5-49(2) aggravating circumstance does not exist, and it is not considered.
(3) The Defendant did knowingly create a great risk of death to many persons throughout this murderous, assaultive rage. Therefore, the § 13A-5-49(3) aggravating circumstance does exist and is considered.
The great risk of death began when the defendant first emerged from his mother-in-law's house on Palmetto Street and randomly fired at innocent bystanders and passersby. The intentional, indiscriminate, and repeated discharge of a firearm in a residential area irrefutably creates a great risk of death to many persons.
Thereafter at a different location, the defendant shot at Geralyn McMillan while four children were present. At the precise moment Ms. McMillan was shot, she was combing one of the children's hair. The defendant then went to yet another location where he shot Freddie and Louise Baker. Finally as he was about to be apprehended, the defendant shot at, but missed, Officer David Cashman of the Mobile Police Department.
The number of victims who were murdered, shot, and shot at by the defendant — seven — is undeniable proof that the defendant created a great risk of death to many persons.
(4) The capital offense was not committed while the defendant was engaged in the commission of a robbery. Therefore, the § 13A-5-49(4) aggravating circumstance does not exist, and it is not considered.
(5) The capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody within the meaning of § 13A-5-49(5). Therefore, the § 13A-5-49(5) aggravating circumstance does not exist, and it is not considered.
(6) The capital offense was not committed for pecuniary gain within the meaning of § 13A-5-49(6). Therefore the §13A-5-49(6) aggravating circumstance does not exist, and it is not considered.
(7) The capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. Therefore, the § 13A-5-49(7) aggravating circumstance does not exist, and it is not considered.
(8) The capital offense was not especially heinous, atrocious or cruel compared to other capital offenses within the narrow meaning of § 13A-5-49(8) and within the narrow meaning of Kyserv. State, 398 So.2d 330 (Ala. 1981). Therefore, the §13A-5-49(8) aggravating circumstance does not exist, and it is not considered.
The Court considers only that aggravation averred in §13A-5-49(3) — that the defendant created a great risk of death to many persons — for purposes of sentencing.
 The Mitigating Circumstances
The defendant presented no evidence of mitigating circumstances beyond that introduced at the guilt stage and contained in the pre-sentence report. Nonetheless, the Court has thoroughly and conscientiously considered all statutorily enumerated mitigating circumstances as well as any non-statutory mitigating circumstance which might reasonably appertain.
In regard to the mitigating circumstances, the Court finds the following:
(1) The defendant has no significant history of prior criminal activity within the meaning of Code of Alabama *Page 125 
(1975), § 13A-5-51(1). Therefore, the § 13A-5-51(1) mitigating circumstance does exist, and it is considered.
(2) The capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance. The Court does carefully consider this potential mitigating circumstance, but, after a thorough evaluation of all the evidence, finds the § 13A-5-51(2) mitigating circumstance does not exist for the following reasons:
(a) Larry Rodrigues, a prosecution witness, testified that approximately two weeks before the murders, the defendant said if Diane, his ex-wife, came to town, he was going to "kill a bunch of people". Diane Wesley returned to Mobile June 3, 1983; the murders occurred June 4, 1983;
(b) The defendant told Dr. Harry McClaren he acquired the murder weapon on the morning of the killings;
(c) The pre-sentence report reflects that the defendant had no history of mental or emotional disorders and/or treatment prior to the date of these murders, and his mother, with whom the defendant lived, told the author of the report that she had never observed her son behave in a manner that made her fearful until June 4, 1983;
(d) The non-random method by which the defendant selected his victims, except for Priscilla Fisher Brazeal, strongly suggests that his conduct was purposeful and deliberate. He could have shot Rudolph Pugh, Katherine Morrissette, the children with Geralyn McMillan, Mynell Baker, and two of his aunts, but consciously chose not to. Lucy Nelson, one of his aunts, testified that on the day of this rampage, the defendant told her: "I'm not going to hurt you. All I want to do is hurt those who hurt me." And he told Rudolph Pugh: "You're my buddy, and I won't hurt you";
(e) Prior to his capture, the defendant wrote a note on a Kleenex box, which is in evidence, absolving Rudolph Pugh of any criminal culpability;
(f) The defendant directed the navigation of Rudolph Pugh literally from one end of Mobile County to another;
(g) As previously noted, the defendant testified in his own behalf. The Court had ample opportunity to observe the defendant's demeanor and weigh his testimony. He made no reference to hallucinations of any kind on June 4, 1983; he appeared lucid and coherent; and he could think and respond in a rational manner.
Based on all the evidence, the existence of [the] §13A-5-51(2) mitigating circumstance was disproven.
(3) The victims were not participants in the defendant's conduct, and they did not consent to it. Therefore, the §13A-5-51(3) mitigating circumstance does not exist, and it is not considered.
(4) The defendant was not an accomplice in the capital offense and his participation was not relatively minor. Instead, the defendant was the principal who actually shot the victims. Therefore, the § 13A-5-51(4) mitigating circumstance does not exist, and it is not considered.
(5) The defendant did not act under extreme duress or under the substantial domination of another person when he committed the capital offense. Therefore, the § 13A-5-51(5) mitigating circumstance does not exist, and it is not considered.
(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired at the time he committed the capital offense. The Court, after due consideration of all evidence and available information, finds that this § 13A-5-51(6) mitigating circumstance does not exist for the following reasons:
(a) The evidence disproves the existence of this mitigating circumstance;
(b) The expert testimony on this issue is in conflict. The Court notes that defense experts testified that the defendant suffered from schizophrenia at the time of the murders and the prosecution's experts testified that he could appreciate the criminality of his conduct and conform his conduct to the requirements of law. The trial *Page 126 
record will further reveal that Dr. Clyde Van Rosen, one of the defense experts, was not asked if the defendant could conform his conduct to the requirements of law and Dr. Claude Brown, the other defense expert, testified that the defendant probably did appreciate to some extent the criminality of his conduct;
(c) The Court, moreover, after observing the prosecution's experts and hearing their testimony, attaches great significance to the credibility of this evidence. Dr. McClaren based his opinion that the defendant could appreciate the criminality of his conduct and conform it to the requirements of law on an array of data not utilized by Dr. [Van] Rosen and Dr. Brown. Dr. McClaren not only tested and interviewed the defendant, he reviewed the investigative reports and personally interviewed several of the key witnesses. For these reasons, the Court attaches more weight to the testimony of Dr. McClaren. That testimony was fortified by Dr. Nagi's conclusion that the defendant mimicked signs of mental illness;
(d) Finally, the sequence of events as previously outlined in paragraph 2(a) through 2(g) under the heading "The Mitigating Circumstances" further convinces the Court that the defendant, indeed, could appreciate the criminality of his conduct and conform his conduct to the requirements of law on June 4, 1983.
(7) The defendant had passed his twentieth birthday at the time he committed the capital offense. In view of the facts and circumstances, the Court finds that the age of the defendant at the time of the crime is not a mitigating circumstance. Therefore, the § 13A-5-51(7) mitigating circumstance does not exist, and it is not considered.
As non-statutory mitigating circumstances, the Court finds that the defendant served in the U.S. Marine Corps, received a medical discharge with a disability pension, and he began to abuse alcohol and drugs after his discharge from military service.
 The Jury's Recommendation
The jury's advisory verdict recommended a sentence of life imprisonment without parole. The jury's vote was eight for life without parole and four for death by electrocution. The Court gives very serious consideration and substantial weight to that recommendation.
 The Sentence
Having weighed the single statutory aggravating circumstance against all the statutory and non-statutory mitigating circumstances, and having given careful consideration and substantial weight to the jury's advisory recommendation, the Court finds that the aggravating circumstance in this case outweighs the mitigating circumstances and that the punishment should be death notwithstanding the jury's contrary recommendation.
It is therefore ORDERED, ADJUDGED AND DECREED that the defendant, Ronald Harvey Wesley, is guilty of the Code ofAlabama (1975), § 13A-5-40(a)(10) capital offense as charged in the indictment.
It is further ORDERED, ADJUDGED AND DECREED that the defendant, Ronald Harvey Wesley, is sentenced to death by electrocution. Pursuant to Alabama Rule of Appellate Procedure 8(d)(1), the date of execution is to be set by the Alabama Supreme Court at the appropriate time. The Defendant is to be remanded to the custody of the Department of Corrections.
DONE and ORDERED this the 26 day of October, 1988.
 /s/ Ferrill D. McRae ____________________ CIRCUIT JUDGE
[6] In general, only hearsay that is customarily relied upon by experts and likely to be trustworthy is a proper basis for an expert opinion. E.g., Ex parte Graham, 380 So.2d 850 (Ala. 1979) (to show basis of expert appraiser's property valuation, hearsay evidence of other land sales is permissible). Hagler v.Gilliland, 292 Ala. 262, 292 So.2d 647 (1974) (expert medical opinion may be based on medical history as stated by patient). See generally, E. Cleary, McCormick on Evidence, §§ 15, 247 (1972).
[7] "We do not suggest, however, that hearsay is admissiblewhenever it is assertedly offered to show the basis of an expert opinion. In jury cases the trial court should consider excluding such evidence as unduly prejudicial or at least adding a cautionary instruction. Cf. Bryan v. John BeanDivision of FMC Corp., 566 F.2d 541, 545 (5th Cir. 1978)."
[1] On cross-examination by defense counsel, Dr. McClaren did state, without objection, that when he was at Taylor Hardin Secure Medical Facility he thought that the defendant had paranoid schizophrenia "and that matched what Dr. Brown and Dr. Rosen had seen in their evaluations earlier."
[2] There was no objection whatsoever to the court's oral charge so as to properly preserve this issue for our review under Rule 14, A.R.Cr. P.Temp. However, in cases where the death penalty has been imposed, Rule 45A, A.R.A.P., requires this court to "notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, . . . whenever such error has or probably has adversely affected the substantial right of the appellant." Although we find no error in the charge as given, we deem it appropriate to address this issue in our opinion.
[3] Section § 15-16-2, Ala. Code 1975, provides:
 "Every person over 14 years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury."
[4] We are aware that Boswell v. State, 63 Ala. 307, 316 (1879), contains the following statement: "An unsound mind can not form a criminal intent; and as [a] crime includes both act and intent, an indispensable constituent is wanting, when the mind of the perpetrator is diseased in that degree, which is, by the law, pronounced insanity." We do not read this statement to indicate that proof of sanity is necessary to proof of intent. Indeed, it is clear that the burden of proving sanity never rests on the state, nor does it, in this state, shift to the prosecution once the defendant introduces evidence of insanity.E.g. Christian v. State, 351 So.2d 623, 624 (Ala. 1977); Grammerv. State, 239 Ala. 633, 637, 196 So. 268, 271 (1940);Cunningham v. State, 426 So.2d 484, 490 (Ala.Cr.App. 1982). Cf.Grace v. Hopper, 234 Ga. 669, 217 S.E.2d 267, 269 (1975), cert. denied, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976) ("in order to comport with due process the prosecution must carry the burden of proving all critical essential elements of the crime charged against a defendant. However, sanity has not been treated as a critical essential element of the offense which the prosecution is required to prove beyond a reasonable doubt"). Compare cases collected at Annot., 17 A.L.R. 3d 146, Part II (1968 Supp. 1989). We note that requiring a defendant to bear the burden of proof of an insanity defense now appears to be the majority view among the states. See R. Simon D. Aaronson, The Insanity Defense 251-63 (1988).
[5] We note that the Ohio statute required the defendant "to prove his insanity beyond a reasonable doubt," Leland,343 U.S. at 792, 72 S.Ct. at 1004, in contrast to our § 15-16-2, which requires that the defendant prove his insanity "to the reasonable satisfaction of the jury." See Hutchens v. State,45 Ala. App. 507, 517, 232 So.2d 687, 696, writ denied and appeal dismissed, 285 Ala. 755, 232 So.2d 700 (1970).
[6] Our research has revealed two cases in which courts have indicated that the presumption of sanity should not be included in the jury instructions. These cases are, however, distinguishable from the case at bar. In State v. Grilz,136 Ariz. 450, 666 P.2d 1059, 1064 (1983), the Arizona Supreme Court stated: "[T]he presumption of sanity, whether statutory or not, vanishes once the accused presents sufficient evidence to raise a reasonable doubt as to sanity, and the presumption should not be mentioned in jury instructions." However, at the time Grilz was decided, Arizona placed the burden on the prosecution to prove sanity. The court held that it was not fundamental error to instruct the jury on the presumption of sanity "[a]s long as the jury is clearly instructed that the state has the burden of proving the accused sane beyond a reasonable doubt." Id. 666 P.2d at 1065. Arizona has since, by statutory change, placed the burden of proving the defense of insanity on the defendant, see State v. Fletcher, 149 Ariz. 187,717 P.2d 866 (1986), and the Grilz decision may no longer be valid. In State v. Trieb, 315 N.W.2d 649 (N.D. 1982), the North Carolina Supreme Court condemned a Sandstrom-type intent presumption. The court also indicated that an unexplained instruction on the presumption of sanity should not be given. However, the court noted that this presumption would not be unconstitutional "if its legal effect were properly explained."Id. at 654. In the present case there was no Sandstrom-type intent presumption and the presumption of sanity was fully explained by the trial court. *Page 127